**MEDSPRING GROUP, INC., a Utah corporation, Plaintiff,**

v.

**Vicky FENG, an individual; Gate International, a California corporation; and Does I through V, Defendants.**

No. 1:05 CV 00042 DAK.

United States District Court,
D. Utah,
Northern Division.

April 25, 2005.

Peter W. Guyon, Esq., Salt Lake City, UT, for Plaintiff.

Robyn L. Phillips, Esq., Workman Nydegger, Salt Lake City, UT, for Defendant.

## MEMORANDUM DECISION AND ORDER

KIMBALL, District Judge.

This matter is before the court on Plaintiff's Motion for Preliminary Injunction. A hearing on the motion was held on April 19, 2005 at 10:30 a.m. At the hearing, Plaintiff was represented by Peter W. Guyon and Defendants were represented by L. David Griffin and Robyn L. Phillips. Before the hearing, the court carefully considered the memoranda and other materials submitted by the parties. Since taking the motion under advisement, the court has considered all additional materials submitted by the parties since the hearing and has further considered the law and facts relating to the motion. Now being fully advised, the court renders the following Memorandum Decision and Order.

## BACKGROUND

Plaintiff Medspring Group, Inc. ("Medspring") is a corporation located in Bountiful, Utah, which researches, develops and markets medical devices. Medspring's products include a Hemostatic Biodegradable Gauze (the "S–99 Gauze") and Hemostatic Satin Gauze (the "S–100 Gauze"), a medical device made out of a gauze material which speeds up bleeding coagulation and then dissolves at the bleeding wound. In the spring of 2002, Plaintiff hired Defendant Vicky Feng ("Feng") as a consultant. Medspring claims that in this capacity, Feng was exposed to confidential information and trade secrets relating to Medspring's medical devices, including the S–99 and S–100 Gauze. In order to protect its confidential information and trade secrets, Medspring had Feng execute a Mutual Non–Disclosure Agreement ("Agreement") by which Feng agreed not to disclose Plaintiff's "Confidential Information," including trade secrets. Plaintiff claims that Feng executed the Agreement on May 31, 2002, in both her individual capacity and as the C.E.O. for Defendant Gate International, a California corporation.

Feng terminated her employment with Medspring on August 1, 2002. In early 2005, Medspring became aware that Feng had started her own company, Regional Medical Solutions, Inc., through which she has been marketing a medical device identical to that of the S–99 and S–100 Gauze under the name of "BloodSTOP." Medspring believes that Feng is illegally and wrongfully using trade secrets belonging to MedSpring in order to market her "BloodSTOP" products. Medspring has

accordingly brought suit against the Defendants alleging a cause of action for injunctive relief based on Defendants' breach of the Agreement as well as causes of action for Violation of the Uniform Trade Secrets Act, Tortious Interference with Business Relationships and Civil Conspiracy.

## PROCEDURAL HISTORY

On March 24, 2005, Medspring filed a Verified Complaint for Injunctive and Other Relief (the "Complaint") and a Motion for Temporary Restraining Order and for Order to Show Cause (the "Motion") in the Second District Court of Davis County, State of Utah. On the same day, the Second District Court held a hearing on the Motion and issued a Temporary Restraining Order ("TRO") which was to remain in place until April 3, 2005. The TRO essentially prohibits the Defendants from "using, referring to, disclosing and appropriating" or "encouraging, helping, aiding or abetting others to use, refer to, disclose and appropriate" any number of listed items relating to MedSpring's products, including the S–99 and S–100 Gauze. It also orders Defendants to immediately deliver to MedSpring all "Confidential Information" in Defendants possession or control.

On April 1, 2005, before the scheduled preliminary injunction hearing had occurred, the Defendants removed this action to federal court based on diversity jurisdiction. Upon removal, this court issued an Order construing Medspring's Motion as a Motion for Preliminary Injunction. This court additionally ordered that the state court issued TRO was to stay in effect until the court could hear argument on the Motion and enter an order either granting or denying the Motion.

## FINDINGS OF FACT

The court finds that the following facts have been proven by a preponderance of the evidence: ____

### Feng's Employment with MedSpring

1. MedSpring is a Utah corporation which researches, develops and markets a number of medical devices, including a product known as the Hemostatic Biodegradable Gauze (the "S–99 Gauze") and a product known as the Hemostatic Satin Gauze (the "S–100 Gauze").

2. On or around May 22, 2002, MedSpring hired Defendant Vicky Feng ("Feng"), a native of China who speaks fluent Mandarin Chinese, as a consultant. At the time Feng was hired, she had no experience in the medical industry.

3. At the time MedSpring hired Feng, it was a startup company in need of operating capital to further its business activities, especially its business activities in China. Feng was hired to qualify and introduce investors to Plaintiff. In return for her services, Feng was to receive 10% of all investment capital she brought into the company.

4. In her position as a consultant with MedSpring, Feng had access to confidential information regarding MedSpring's products, including the S–99 and S–100 Gauze. Accordingly, MedSpring requested that she execute a Mutual Non–Disclosure Agreement.

5. On May 31, 2002, Feng executed a Mutual Non–Disclosure Agreement ("Non–Disclosure Agreement"). Under this agreement, Feng agreed not to disclose MedSpring's "Confidential Information," including trade secrets, for a period of three years from the date of the Non–Disclosure Agreement.

6. During the Spring and Summer of 2002, Feng raised approximately $50,000 in capital for MedSpring.

7. During her fund raising efforts, Feng researched hemostatic gauze on the internet and learned that there were numerous manufacturers of hemostatic gauze in China. Her research further discovered that one of these manufacturers, Beijing Textile Research Institute ("Bejing Textile"), owns Chinese patents for the S–99 and S–100 Gauze and has filed patent applications for the S–99 and S–100 Gauze in Europe and with the Patent Cooperation Treaty.

8. In or around June of 2002, Feng traveled to China and met with Beijing Textile to obtain information regarding their S–99 and S–100 hemostatic gauze products.

9. Feng disclosed the results of her research and the information she obtained from Beijing Textile to Richard Baggett and Ralph Thomson, officers of MedSpring.

10. On July 20, 2002, Feng and Ralph Thompson met with Beijing Textile regarding its manufacturing of hemostatic gauze.

11. During this meeting, Beijing Textile made it clear to MedSpring that it was the patent holder in China for hemostatic gauze, including the S–99 and S–100 gauze.

12. On August 1, 2002, MedSpring's Board of Directors sent Feng a Confidential Memorandum regarding "Protocols–Negotiating with Beijing Textile Research Institute." This memorandum set forth MedSpring's decision to pursue entering into a deal with Beijing Textile regarding the hemostatic gauze project and made clear that Feng was to have no future contact with Beijing Textile. The Board requested that Feng sign the memorandum indicating her understanding and complete acceptance of the policies set forth therein.

13. Feng did not sign the memorandum. Instead, on August 1, 2002, Feng sent an e-mail to the Board of Directors informing them of her decision to resign from MedSpring.

*MedSpring's Marketing of the S–99 and S–100 Gauze*

14. MedSpring currently markets the S–99 Gauze and S–100 Gauze under the trade names of HemoStyp, ActCel and M+D Gauze.

15. MedSpring does not, as it alleges in its Complaint, have an "exclusive worldwide right to market" the S–99 and S–100 Gauze. The S–99 and S–100 Gauze are subject to several patents, none of which are owned by MedSpring.

16. There are numerous manufacturers of hemostatic gauze throughout China. One of these manufacturers, Beijing Textile, owns Chinese patents for the S–99 and S–100 Gauze and has filed patent applications for the S–99 and S–100 Gauze in Europe and with the Patent Cooperation Treaty.

17. MedSpring has never entered into an agreement with Beijing Textiles to purchase these patents and Beijing Textile has never given, licensed or assigned MedSpring the rights to any of its products, including the S–99 and S–100 Gauze.

18. All medical devices must be registered with and approved by the United States Food and Drug Administration ("FDA") before they can be sold in the United States.

19. MedSpring has registered its S–99 and S–100 Gauze with the FDA and obtained FDA approval.

20. MedSpring's President and Chief Executive Officer, Richard W. Baggett, has extensive knowledge regarding the methods and requirements imposed upon small manufacturers of medical devices by the FDA and has been hired in the past as a consultant to assist companies with ob-

taining FDA approval of their medical devices.

21. MedSpring relied upon Mr. Baggett's experience and understanding of FDA requirements in registering the S–99 and S–100 Gauze with the FDA.

22. Because of his experience registering medical devices with the FDA, Mr. Baggett knew that FDA regulatory Class I, the class for devices which pose the lowest risk to the patient and/or user, is the most desirable class to register a device under. Using his knowledge and experience of FDA procedures, Mr. Baggett was able to register the S–99 and S–100 Gauze under Class I by defining the device as a "sponge for internal use."

23. MedSpring markets its products to "non-traditional" markets within the medical industry.

24. The majority of manufacturers and distributors of medical devices sell to "traditional" medical customers, *i.e.*, hospitals and out-patient surgical centers, because they are the most lucrative to sell to. MedSpring, knowing the difficulty of breaking into this market when not part of a large "buying group," decided to market the S–99 and S–100 Gauze to non-traditional customers such as emergency service providers, municipalities, police and fire departments, veterinarians and dentists.

25. The identity of MedSpring's customers is a closely guarded secret.

26. Currently, MedSpring's largest customer is ActSys Medical Systems ("ActSys").

27. Tri–Anim is a distributor for ActSys.

*Feng's Marketing of "BloodSTOP"*

28. After resigning from her position with MedSpring, Feng started her own company, Regional Medical Solutions, Inc. dba LifeScience PLUS ("Regional").

29. Regional has negotiated an agreement with Beijing Textile to import and sell Beijing Textile's S–99 and S–100 hemostatic gauze products into the United States.

30. Regional obtained FDA approval of its S–99 and S–100 hemostatic gauze products and is currently marketing these products under the name of "BloodSTOP."

31. In December of 2004, Feng hired an FDA regulation consultant by the name of Dr. Richard Fang to assist Regional in complying with FDA regulations and getting FDA approval of the "BloodSTOP" products. Dr. Fang had previously worked with Johnson & Johnson as an expert on FDA applications and issues.

32. After conducting some research on how to register the "BloodSTOP" products with the FDA, Dr. Fang advised Feng to list the "BloodSTOP" products under FDA regulatory Class I, under regulatory category 878.4450, i.e., "gauze sponge for internal," instead of filing a 510k application as Feng had planned. Dr. Fang was paid $640.00 for his consulting work.

33. Information regarding how to properly classify and describe gauze is also available on the FDA website.

34. The process for obtaining FDA approval of a medical device is a public process.

35. In an effort to market the "BloodSTOP" products, Feng purchased a database of nearly 5,000 different medical supply purchasers. Regional has been marketing "BloodSTOP" to the companies and individuals identified in the database.

36. Feng has been in contact with MedSpring's largest customer, ActSys, to discuss ActSys' possible purchase of "BloodSTOP" products.

37. ActSys is easily identified by a simple internet search as a company which purchases hemostatic gauze.

38. A Regional salesperson has contacted Tri–Anim, a distributor of ActSys, in an effort to market the "BloodSTOP" product.

39. Tri–Anim is listed as a medical supply purchaser in the database of medical supply purchasers which Feng purchased.

40. Tri–Anim is listed as a ActSys distributor on ActSys' website.

## CONCLUSIONS OF LAW

The Tenth Circuit has held that in order to obtain injunctive relief, a moving party must establish that: (1) it has a substantial likelihood of prevailing on the merits; (2) that it will suffer irreparable harm unless the preliminary injunction is issued; (3) that the threatened injury outweighs the harm the preliminary injunction might cause the opposing party; and (4) that the preliminary injunction if issued will not adversely affect the public interest. *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir.2001).

### A. *Likelihood of Prevailing on the Merits*

MedSpring's request for injunctive relief is based on its claim that Defendants have misappropriated MedSpring's trade secrets in violation of the Uniform Trade Secrets Act and/or in breach of the Non–Disclosure Agreement. In order to obtain the injunctive relief requested, MedSpring must first establish that it is likely to prevail on at least one of these claims.

### 1. **Violation of the Uniform Trade Secrets Act.**

The Utah Uniform Trade Secrets Act ("Trade Secrets Act") defines trade secret misappropriation as:

(b) disclosure or use of a trade secret of another without express or implied consent by a person who . . . .

(i) used improper means to acquire knowledge of the trade secret; or . . . .

(B) acquired [the trade secret] under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . .

Utah Code Ann. § 13–24–2(2)(b)(ii)(B) (2001). The threshold issue in determining whether a trade secret has been misappropriated is "whether, in fact, there is a trade secret to be misappropriated." *Novell, Inc. v. Timpanogos Research Group, Inc.*, 46 U.S.P.Q.2d 1197, 1212 (Utah Dist. Ct.1998) (quoting *Microbiological Research Corp. v. Muna*, 625 P.2d 690, 696 (Utah 1981)). The Trade Secrets Act defines a trade secret as:

[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.——

Utah Code Ann. § 13–24–2(4). The burden is on the plaintiff to prove the existence of a trade secret, and there is no presumption in his favor. *Novell*, 46 U.S.P.Q.2d at 1212.

MedSpring does not dispute that Feng has the right to sell hemostatic gauze products. MedSpring claims, however, that in selling the BloodSTOP product, Feng has illegally misappropriated three of MedSpring's trade secrets: (a) MedSpr-

ing's method of completing the requirements imposed by the FDA for registering a medical device; (b) MedSpring's method of marketing the S–99 and S–100 gauze; and, (c) the identity of MedSpring's customers.

### a. Method of Obtaining FDA Approval

Richard Baggett, MedSpring's President and CEO, has extensive knowledge of the requirements imposed upon small manufacturers of medical devices by the FDA, knowledge which he has accumulated over the last twenty years. Mr. Baggett used his knowledge of the FDA registration to register the S–99 and S–100 Gauze with the FDA and obtain FDA approval. He defined the S–99 and S–100 Gauze as a "sponge for external use" so that it would fit within the FDA regulatory Class I, the most desirable class to register a device under. MedSpring alleges that this method of classifying and defining the S–99 and S–100 Gauze with the FDA constitutes a trade secret because it is unique, not generally known in the industry, and is protected by MedSpring as a secret.

The court finds that the process for obtaining FDA approval of a medical device is a public process. The FDA website contains general information on the different regulatory classes and on how to properly classify and describe medical devices. In addition, once a product is registered, its device name, classification, device description and regulation number all become available to the public. For example, a search on the FDA website for "gauze" results in a list of gauze devices which have been registered under Class I and gives the device names and descriptions under which they were registered.

In order to constitute a trade secret, the information "must be unknown; it should not be in the public domain nor within the knowledge of the trade . . . ." *Microbiological Research Corp. v. Muna,*

625 P.2d 690, 696 (Utah 1981). The process for registering a medical device with the FDA is clearly in the public domain. At the very least, MedSpring's method for seeking FDA approval is within the general knowledge of the trade as evidenced by the fact that other manufacturers have registered their gauze devices with the FDA by using the same methodology as the one used by MedSpring. MedSpring has therefore failed to meet its burden of proving that its method of obtaining FDA approval constitutes a trade secret.

Even if MedSpring could successfully argue that its method of obtaining FDA approval constitutes a trade secret, it is not likely to succeed in arguing that its method was misappropriated by Feng. Feng has registered the "BloodSTOP" product with the FDA under the same class and definition as that used by MedSpring. MedSpring alleges that there is no way that Feng could have amassed the knowledge and expertise to register her product in this same way without misappropriating the information from MedSpring. The evidence shows, however, that Feng hired an FDA regulation consultant in December of 2004 by the name of Dr. Richard Fang for the purpose of assisting Regional in getting FDA approval of the "BloodSTOP" products. After conducting research on how to register the "BloodSTOP" products with the FDA, Dr. Fang advised Feng to list the "Blood-STOP" products under FDA regulatory Class I, under regulatory category 878.4450, i.e., "gauze sponge for internal," instead of filing a 510k application as Feng had planned. In light of this evidence, it is not substantially likely that MedSpring will prevail on its claim that Feng misappropriated information obtained by MedSpring in registering her "Blood-STOP" device.

### b. Method of Marketing the S–99 and S–100 Gauze.

MedSpring markets its products to "non-traditional" customers within the medical industry. The majority of manufacturers and distributors of medical devices sell to "traditional" medical customers, *i.e.*, hospitals and out-patient surgical centers, because they are the most lucrative customers to sell to. MedSpring, however, knowing the difficulty of breaking into this market when not part of a large "buying group," decided to market the S–99 and S–100 Gauze to non-traditional customers such as emergency service providers, municipalities, police and fire departments, veterinarians and dentists. MedSpring claims that its targeting of non-traditional customers is a unique marketing plan which is not generally known, and so constitutes a trade secret.

■ Although MedSpring's marketing plan may not be generally known, it does not constitute a trade secret if it is "within the knowledge of the trade ...." *Muna,* 625 P.2d at 696. MedSpring claims that the difficulty of marketing new medical devices to traditional customers is known only to those with knowledge of how purchases of medical devices are made, and would not be known to someone like Feng who has no experience in the medical industry. Regardless of whether MedSpring's marketing method would be unknown to someone with no experience in the medical industry, by MedSpring's own admission, it is generally known within the medical device industry.

In addition, MedSpring's claim that it made efforts to keep its marketing strategy confidential is disputed by MedSpring's own testimony. MedSpring testified at the preliminary injunction hearing that Mr. Baggett recently told Feng and Feng's boyfriend, who were trying to start a business selling hospital beds, of the difficulty of trying to sell to hospitals when not part of a large buying group. MedSpring relied on this testimony to support its claims that Feng had knowledge of MedSpring's marketing strategy. The fact that Mr. Baggett disclosed MedSpring's marketing strategy to Feng's boyfriend, someone who was not subject to a non-disclosure agreement, evidences that reasonable efforts were not made to maintain the secrecy of MedSpring's marketing strategy. The court therefore finds that MedSpring's marketing strategy does not constitute a trade secret.

Even if MedSpring's marketing strategy were a trade secret, MedSpring has failed to demonstrate that Defendants have misappropriated this marketing strategy. Regional has purchased a database of nearly 5,000 different medical supply purchasers and has been marketing "BloodSTOP" to the companies and individuals identified in the database. This marketing strategy differs substantially from the marketing strategy relied upon by MedSpring. MedSpring's claim that its marketing strategy has been misappropriated by Defendants is simply unsupported.

### c. The Identity of MedSpring's Customers.

MedSpring additionally argues that the identity of its customers constitutes a trade secret. Feng has attempted to market the BloodSTOP product to ActSys, MedSpring's largest customer. Feng has also contacted one of ActSys' distributors, Tri–Anim. MedSpring alleges that the only possible way that Feng could have learned that ActSys was MedSpring's customer, and identify Tri–Anim as a distributor of ActSys, was by misappropriating the identify of MedSpring's customers.

■ In order to constitute a trade secret, the identity of customers must not be "readily ascertainable outside the employer's business as prospective users or

consumers of the employer's service or products .... " *Muna*, 625 P.2d at 700 (quoting *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 328 N.Y.S.2d 423, 278 N.E.2d 636, 639–641 (1972)). A simple internet search for the term "hemostatic gauze" identifies ActSys as a company which distributes hemostatic gauze under the product name ActCel. ActSys is therefore readily ascertainable as a prospective consumer of hemostatic gauze. ActSys' home page on the internet includes a list of its current distributors, including Tri–Anim. In addition, Tri–Anim is listed as a medical supply purchaser in the database purchased by Feng. The identity of Tri–Anim is therefore readily ascertainable as well. Because MedSpring's customers are readily ascertainable by others, their identity does not constitute a trade secret.

MedSpring has failed to meet the burden of proving the existence of its three alleged trade secrets. MedSpring has also failed to establish that Feng has used any of these alleged trade secrets in marketing the BloodSTOP product. MedSpring therefore has not established that it has a substantial likelihood of prevailing on its claim that Defendants have violated the Trade Secrets Act.

### 2. Breach of the Non–Disclosure Agreement.

MedSpring's Motion is also based on its claim that Defendants have misappropriated or disclosed MedSpring's confidential information in breach of the Non–Disclosure Agreement. Pursuant to this agreement, Defendants are not to disclose or use MedSpring's "Confidential Information" for a term of three years from the date of the agreement, or until May 31, 2005. The agreement's definition of "Confidential Information" is broader than the Trade Secret Act's definition of "Trade Secret." The fact that MedSpring is not likely to prevail on its claim that Defendants violated the Trade Secrets Act,

therefore, does not preclude a finding that Defendants misappropriated confidential information in breach of the Non–Disclosure Agreement.

As explained in Paragraph 1.2 of the Non–Disclosure Agreement, "Confidential Information" does not include information that:

(b) is developed by [Defendants] independently of any of the Confidential Information received in confidence from [MedSpring], as evidenced by [Defendants'] written records; ....

(d) is or becomes generally available to the public other than as a result of a disclosure by [MedSpring]; or

(e) is disclosed by [Defendants] to a third party without confidentiality restriction ....

MedSpring alleges that Defendants have breached the Non–Disclosure Agreement by misappropriating MedSpring's method of applying for FDA approval, its method of marketing medical devices, and the identity of MedSpring's customers. As explained previously, however, all of the information allegedly misappropriated by Defendants was either developed by the Defendants independently, was generally available to the public, or was disclosed by MedSpring to a third party without restriction of confidentiality. Pursuant to Paragraph 1.2 of the Non–Disclosure Agreement, therefore, none of the information allegedly misappropriated constitutes "Confidential Information."

MedSpring has not demonstrated a substantial likelihood of success on its claim that Defendants breached the Non–Disclosure Agreement. The court therefore finds that MedSpring has failed to establish the first element necessary to obtain injunctive relief.

### B. *Irreparable Harm*

MedSpring also fails to establish that it will be irreparably harmed if a

preliminary injunction is not entered. Irreparable harm is suffered where an injury cannot be adequately atoned for in money. *Pierce*, 253 F.3d at 1250. MedSpring claims that the damages it will suffer over time as a result of the Defendants misappropriation of its trade secrets, such as the loss of its customers and the loss of its stake in the hemostatic gauze market, are intangible and cannot be atoned for in money.

Pursuant to the terms of the Non–Disclosure Agreement, Defendants are bound not to disclose MedSpring's "Confidential Information," including trade secrets, only for a period of three years from the date of the agreement. The three year term expires on May 31, 2005. From this point forward, the Defendants can freely disclose MedSpring's "Confidential Information". MedSpring's damages are therefore limited to the time from which Defendants allegedly first misappropriated MedSpring's confidential information until May 31, 2005. Any damages incurred by MedSpring during this discrete period of time will be identifiable and so can be calculated and atoned for in money. MedSpring, therefore, has not established that it will be irreparably harmed if a preliminary injunction is not issued.

### C. Balance of Hardships

█ The court also finds that the harm which will result to Defendants from the issuance of a preliminary injunction outweighs any threatened injury to MedSpring. Defendants are contractually obliged not to use or disclose MedSpring's Confidential Information only until May 31, 2005. Any threatened injury to MedSpring, therefore, is for a very limited period of time. The issuance of a preliminary injunction, however, would prevent Defendants from marketing or selling its "BloodSTOP" device for the duration of the litigation thereby causing it to lose the benefits of efforts it has already spent publicizing the product. Defendants would lose clients, lose market power and lose credibility within the trade. The issuance of a preliminary injunction at this time would also be particularly harmful to Defendants in light of the upcoming trade show which it would be prevented from participating in.

### D. Public Interest

█ Medspring additionally fails to establish that the issuance of a preliminary injunction would not adversely affect public interest. As demonstrated by Utah's adoption of the Trade Secrets Act, public policy does support the development of new technologies by authorizing injunctive protection of trade secrets. *Novell*, 46 U.S.P.Q.2d at 1215. This goal, however, must be balanced against the public's interest in encouraging competition and supporting an individual's right to exploit his own skill and knowledge. *Utah Medical Products, Inc. v. Clinical Innovations Assoc., Inc.*, 79 F.Supp.2d 1290, 1312 (D.Utah 1999). Preventing Defendants from using information which is within the public domain, readily ascertainable, or generally known within the medical device manufacturing trade to compete against MedSpring would be adverse to this interest. In light of the evidence presented by the parties, the Court finds that the issuance of a preliminary injunction in this case would adversely affect the public interest in encouraging competition.

### E. Summary

MedSpring has failed to establish that it has a substantial likelihood of prevailing on the merits of either its claim that Defendants violated the Trade Secrets Act or that Defendants breached the Non–Disclosure Agreement by misappropriating MedSpring's "Confidential Information."

The court additionally finds that MedSpring will not suffer irreparable harm unless the preliminary injunction is issued, that the harm which will result to Defendants from the issuance of a preliminary injunction outweighs any threatened injury to MedSpring, and the issuance of a preliminary injunction would adversely affect the public interest. The Motion for Preliminary Injunction is therefore denied.[1]

### CONCLUSION

For the foregoing reasons, and good cause appearing, IT IS HEREBY ORDERED that:

(1) MedSpring's Motion for Preliminary Injunction (originally filed as a motion for temporary restraining order in the state court action) is DENIED; and,

(2) The Temporary Restraining Order issued by Judge Thomas L. Kay of the Second District Court of Davis County, State of Utah on March 24, 2005, is hereby DISSOLVED.

---

1. Although the court has ruled in favor of the Defendants by denying the Plaintiff's Motion for Preliminary Injunction, it notes that Mr. Griffin's use of sarcasm and personal attacks against the Plaintiff and the Plaintiff's counsel at the preliminary injunction hearing was improper and unhelpful.