IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| CDC Restoration & Construction, LC, | ) | OPINION |
| | ) | |
| Plaintiff and Appellant, | ) | Case No. 20100127-CA |
| | ) | |
| v. | ) | |
| | ) | F I L E D |
| Tradesmen Contractors, LLC; Kenneth | ) | (February 24, 2012) |
| Allen; Paul Carsey; Jay Lasater; Michael | ) | |
| Lasater; Shauna Lasater; and Lindsey | ) | 2012 UT App 60 |
| Mounteer, | ) | |
| | ) | |
| Defendants and Appellees. | ) | |

-----

Third District, Salt Lake Department, 080908435
The Honorable Robert K. Hilder

Attorneys:     Richard F. Ensor and Kari A. Tuft, Salt Lake City, for Appellant
Romaine C. Marshall, P. Bruce Badger, and Rachel S. Anderson, Salt
Lake City, for Appellees

-----

Before Judges McHugh, Voros, and Orme.

VOROS, Associate Presiding Judge:

¶1     CDC Restoration & Construction, LC (CDC) appeals from summary judgment in favor of Tradesmen Contractors, LLC (Tradesmen), Kenneth Allen, Paul Carsey, Jay Lasater, Michael Lasater, Shauna Lasater, and Lindsey Mounteer (collectively, Defendants).[1]  CDC's claims arise out of the Defendants' creation of Tradesmen,

---

[1]On appeal, the Lasaters submitted a separate brief from Tradesmen, Allen, Carsey, and Mounteer.  Where appropriate, we refer to the non-Lasater defendants

(continued...)

competition against CDC for work projects, and alleged misappropriation of confidential information and trade secrets. We affirm in part and reverse in part.

BACKGROUND

¶2    CDC is a contractor that primarily repairs concrete and installs protective and decorative coatings in Utah and the surrounding states. From 2003 to 2005, CDC performed concrete repair and restoration work for Kennecott Utah Copper Corporation (Kennecott). Pursuant to Kennecott's policy, CDC entered into a preferred provider agreement (PPA) with Kennecott before performing the work. The PPA listed pricing information to provide Kennecott some assurance of what a given project might cost. Included in CDC's PPA was pricing information for its hourly employees as well as hourly, daily, weekly, and monthly rates for various pieces of industrial equipment. The PPA stated that the information in it was confidential.

¶3    Defendant Carsey began working for CDC in the early 1990s and eventually became a CDC foreman. He worked in that capacity from 2004 to 2005, during which time CDC was performing work for Kennecott. Carsey never signed a confidentiality agreement, but was told that CDC's pricing information was confidential. Carsey resigned in January 2006, informing CDC's owner Ralph Midgley that he was "burned out" and was going to "flip houses." However, CDC alleges that before Carsey resigned from CDC, he had begun speaking with the other defendants about starting Tradesmen (a company that would compete directly with CDC for work at Kennecott), had begun working for Tradesmen, and had been elected Tradesmen's vice president and project developer. Carsey testified that he did not begin working for Tradesmen until after he had resigned from CDC.

¶4    Defendant Allen worked for an independent contractor hired by Kennecott to supervise work performed at Kennecott's refinery. Allen was a project manager and, in that capacity, supervised CDC's work and knew CDC's confidential pricing information. Before working at the refinery, Allen worked as a project manager, coordinator, and director for Kennecott for twenty-eight years. By December 2005,

---

[1](...continued)
collectively as the Tradesmen Defendants.

Allen had formalized his ownership interest in Tradesmen. CDC alleges that Allen and Carsey frequently exchanged phone calls during the period when both CDC and Tradesmen were formulating bids for a Kennecott job. CDC also alleges that Allen went to great lengths to hide his involvement with Tradesmen during this time, including sending an email to Kennecott management indicating that he was unfamiliar with Tradesmen.

¶5    In late 2005, Kennecott put a contract up for bid for a project known as E-Bay (the Project) at its refinery. In January 2006, Kennecott conducted a pre-bid walkthrough of the refinery. Carsey participated in the walkthrough on behalf of CDC. Tradesmen also participated in the walkthrough. Noticing Tradesmen's presence, Midgley asked Carsey if he knew anything about Tradesmen. Carsey said he did not. In the days following the walkthrough, Carsey assisted CDC with every aspect of assembling its bid for the Project. Meanwhile, Tradesmen also put together a bid for the Project. The Tradesmen Defendants concede that they used the labor rates in CDC's PPA as a starting point for Tradesmen's PPA. They claim that Allen, primarily, assembled Tradesmen's bid. CDC alleges that Carsey assisted in assembling Tradesmen's bid even while he was in the employ of CDC. Allen and Carsey deny that allegation. Both testified that Carsey did not assist Allen in preparing Tradesmen's bid. However, defendant Michael Lasater, a Tradesmen manager, testified that Carsey was frequently at the Tradesmen offices during the time that Tradesmen was formulating its bid.

¶6    CDC, Tradesmen, and a third company each submitted bids for the Project. CDC's bid was the highest, Tradesmen's the second highest, and the third company's the lowest. On January 24, 2006, Kennecott awarded the Project to Tradesmen. In an email, Dan Larsen, Kennecott's then senior electrical engineer and supervisor of the Project stated, "After reviewing the bids and talking this over . . . we felt that Tradesm[e]n/Paul Carsey should do this work. Working in the tank house basement is dangerous and [we] felt his experience and concern for safety were a good fit to have the repairs completed in the [Project]." Dennis Woolley, Kennecott's maintenance superintendent, testified that price was also a factor in awarding the bid.

¶7    CDC sued. It alleged (1) misappropriation of trade secrets against Tradesmen, Allen, and Carsey for improper use of its labor and equipment rates and bid information; (2) breach of fiduciary duty against Carsey; (3) intentional interference with prospective economic relations against Tradesmen, Allen, and Carsey; and (4) civil conspiracy against all Defendants.

¶8      The trial court entered summary judgment in favor of Defendants on all claims. It ruled that CDC failed to present sufficient evidence to demonstrate a genuine issue of material fact as to whether its labor and equipment rates were trade secrets under the Utah Uniform Trade Secrets Act (the UTSA or Utah UTSA), *see* Utah Code Ann. §§ 13-24-1 to -9 (2009), whether Tradesmen, Allen, and Carsey used CDC's labor and equipment rates and bid information, and whether Carsey owed CDC a fiduciary duty. The court also ruled that the UTSA preempted all remaining claims.

ISSUES AND STANDARD OF REVIEW

¶9      CDC first contends that it presented sufficient evidence to demonstrate a genuine issue of material fact as to whether its labor and equipment rates and other bid information are trade secrets and as to whether Tradesmen, Allen, and Carsey used those trade secrets. CDC next contends that it presented sufficient evidence to demonstrate a genuine issue of material fact as to whether Carsey owed it a fiduciary duty. CDC then contends that its intentional interference with prospective economic relations claim is not preempted by the UTSA. Finally, CDC contends that its civil conspiracy claim is not preempted by the UTSA.

¶10     Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). We "review[] a trial court's legal conclusions and ultimate grant or denial of summary judgment for correctness and view[] the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Bingham v. Roosevelt City Corp.*, 2010 UT 37, ¶ 10, 235 P.3d 730.

ANALYSIS

I. Trade Secrets

A.  CDC's Labor and Equipment Pricing

¶11     CDC first contends that the trial court erred when it ruled that CDC "failed to present evidence that is sufficient to establish a genuine issue of material fact that its labor and equipment rates derive independent economic value from not being generally

known to, and not being readily ascertainable by proper means by," Tradesmen, Carsey, and Allen.

¶12    Specifically, CDC alleges that Tradesmen misappropriated the specific labor and equipment rates set forth in CDC's PPA. CDC claims not only that each item on this list is a trade secret, but also that the list itself is entitled to protection as a unique compilation. CDC points out that "an alchemy of information may constitute a trade secret when its separate parts are each generally known and readily ascertainable, but, when analyzed together such parts derive independent economic value." *See USA Power, LLC v. PacifiCorp*, 2010 UT 31, ¶ 42, 235 P.3d 749. CDC also contends that the trial court erred in ruling that CDC failed to establish that Tradesmen used CDC's labor and equipment rates.

¶13    "What constitutes a trade secret is a question of fact." *Envirotech Corp. v. Callahan*, 872 P.2d 487, 494 (Utah Ct. App. 1994) (citing *Telex Corp. v. International Bus. Corp.*, 510 F.2d 894, 928 (10th Cir. 1975); *Kodekey Elecs. Inc. v. Mechanex Corp.*, 486 F.2d 449, 455 (10th Cir. 1973)). "The burden of demonstrating the existence of a trade secret is on the plaintiff, and there is no presumption in his or her favor." *Id.* (citing *Microbiological Research Corp. v. Muna*, 625 P.2d 690, 696 (Utah 1981)).

¶14    Where, as here, the nonmoving party will bear the burden of proof at trial, the movant "may satisfy its burden on summary judgment by showing, by reference to 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' that there is no genuine issue of material fact." *Orvis v. Johnson*, 2008 UT 2, ¶ 18, 177 P.3d 600 (quoting Utah R. Civ. P. 56(c)). Upon such a showing, "the burden then shifts to the nonmoving party, who 'may not rest upon the mere allegations or denials of the pleadings,' but 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* (emphasis omitted) (quoting Utah R. Civ. P. 56(e)).

¶15    To establish a claim for misappropriation of a trade secret, the proponent of the trade secret must show "(1) the existence of a trade secret, (2) communication of the trade secret to [the defendant] under an express or implied agreement limiting disclosure of the secret, and (3) [defendant]'s use of the secret that injures [the proponent]." *Water & Energy Sys. Tech., Inc. v. Keil*, 1999 UT 16, ¶ 9, 974 P.2d 821. Therefore, our first step in this analysis is determining "'whether, in fact, there is a trade

secret to be misappropriated.'" *USA Power*, 2010 UT 31, ¶ 41 (quoting *Microbiological Research*, 625 P.2d at 696).

¶16     The Utah UTSA defines "trade secret" to include a compilation that (1) derives economic value from not being known or readily ascertainable by others, and (2) is the subject of reasonable efforts to maintain its secrecy:

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>        (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>        (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Utah Code Ann. § 13-24-2(4).  A proponent of a trade secret must establish both prongs of the test.  *See id.*; *Microbiological Research*, 625 P.2d at 696.

¶17     In 1981, our supreme court held in *Microbiological Research Corp. v. Muna*, 625 P.2d 690 (Utah 1981), that a unique combination of generally known elements may qualify as a trade secret:

> "[A] unique combination of generally known elements or steps can qualify as a trade secret, if it represents a valuable contribution attributable to the independent efforts of the one claiming to have conceived it. . . .  The subject matter of the trade secret must be unknown; it should not be in the public domain nor within the knowledge of the trade . . . ."

*Id.* at 696 (quoting 2 Rudolf Callman, *Unfair Competition, Trademarks & Monopolies* § 53.3, at 388 (3d ed.)).  The court recently reaffirmed this holding in *USA Power, LLC v. PacifiCorp*, 2010 UT 31, 235 P.3d 749.  *See id.* ¶¶ 43–45.  A compilation may qualify as a trade secret "'if extensive effort is required to pierce its veil by assembling the literature concerning it and thereby uncover its parts'"; on the other hand, "'[i]f this can be readily done by one who is normally skilled in the field and has a reasonable familiarity with

its trade literature, the secret may no longer be entitled to protection.'" *Microbiological Research*, 625 P.2d at 696 (quoting 2 Callman, *Unfair Competition* § 53.3, at 391–92).

¶18    The supreme court has also held that, in determining whether information constitutes a trade secret, a court may consider the factors listed in the first Restatement of Torts:

> "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in its business; (3) the extent of measures taken by the business to guard the secrecy of its information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

*USA Power*, 2010 UT 31, ¶ 45 & n.8 (quoting Restatement of Torts § 757 cmt. b (1939)).

¶19    Even viewing all of the facts and drawing all of the inferences therefrom in the light most favorable to CDC, *see Bingham v. Roosevelt City Corp.*, 2010 UT 37, ¶ 10, 235 P.3d 730, we agree with the trial court that CDC has not carried its burden of setting forth sufficient facts to create a genuine issue of material fact as to the first prong of the statutory definition—that the pricing information was not generally known and not readily ascertainable by proper means.

¶20    CDC points to no record evidence of how its pricing information was in fact developed.  Nor does it cite to any record evidence indicating that its pricing information or its method for obtaining pricing information is unique or especially innovative, such that it could not be readily duplicated by others in the industry.  *See USA Power*, 2010 UT 31, ¶ 45 (listing "the ease or difficulty with which the information could be properly acquired or duplicated by others" as a relevant factor in determining whether information is a trade secret (citation and internal quotation marks omitted)).  Nor does CDC cite any record evidence that the pricing information required great time or financial investment to develop.  *See id.* (listing "the amount of effort or money expended by the business in developing the information" as a relevant factor for determining whether information is a trade secret (citation and internal quotation

marks omitted)); *see also Microbiological Research Corp. v. Muna*, 625 P.2d 690, 700 (Utah 1981) (holding that the plaintiff's customer list was not a trade secret, in part, because "there was no evidence that by the nature of [the] plaintiff's business extraordinary effort was involved in compiling [the] customer list"); *Hammerton, Inc. v. Heisterman*, No. 2:06-CV-00806 TS, 2008 WL 2004327, at *8 (D. Utah May 9, 2008) (holding that the plaintiff presented sufficient evidence to create a genuine issue of material fact that its customer list was a trade secret because the plaintiff presented evidence that the list took ten years and "great expense to the company" to develop); *Delta Med. Sys., Inc. v. Mid-America Med. Sys., Inc.*, 772 N.E.2d 768, 780 (Ill. App. Ct. 2002) (stating that information should be protected as a trade secret "[w]here an employer has invested substantial time, money, and effort to obtain" it).

¶21 CDC does argue that Tradesmen could not have recreated the information: "Tradesmen used CDC's PPA as both a foundation and a verbatim copy because Tradesmen could not have created one by itself." However, this latter assertion is unsupported by any "citations to . . . parts of the record relied on." *See* Utah R. App. P. 24(a)(9). CDC then argues that "[e]ven if Tradesmen could have generated a PPA by itself eventually, it could not have generated a PPA in the short period of time required to submit a bid on the . . . Project." But again, CDC provides no record support for this assertion. *See id.* Accordingly, CDC has not demonstrated that on this point it "set forth specific facts showing that there is a genuine issue for trial." *See* Utah R. Civ. P. 56(e).

¶22 CDC's core argument, made repeatedly in both its opening brief and its reply brief, is this: "Simply put, if Defendants could have easily developed pricing for their PPA without using CDC's confidential information, why did they not do so?" Accepting this argument would in effect create a presumption that trade secret status may be established by use alone. Doing so would collapse the first and third elements of the test—(1) existence of a trade secret and (3) injurious use—into a single element. *See generally, e.g., Water & Energy Sys. Tech., Inc. v. Keil*, 1999 UT 16, ¶ 9, 974 P.2d 821 (stating the three-pronged test for the determination of a trade secret). The presumption would also be inconsistent with *Microbiological Research* and *USA Power*, which identify factors to be considered in determining trade secret status. *See supra* ¶¶ 17–18. Moreover, nothing in those cases identifies mere use of the information as sufficient to sustain a finding of trade secret status, or even as a factor relevant to that inquiry. On the contrary, a plaintiff bears the burden of proving the existence of a trade secret, "and there is no presumption in [its] favor." *See Microbiological Research*, 625 P.2d at 696.

¶23    Midgely did testify that the pricing information took "years" of experience to develop.  However, this generality fails to demonstrate a genuine issue of material fact for two reasons.  First, Midgely did not elaborate on his statement that it took years to develop the pricing information with evidence of how many years it took.  *Cf. id.* at 700 (holding that the plaintiff failed to carry its burden of proving that its customer list was a trade secret, in part, because "the sole evidence in regard to the customer[ list] concerned the expenditures in an unidentified sum").  Second, Midgely testified in his deposition that the PPA was developed with the input of CDC's employees—including Carsey—based on their years of experience.  There is a difference between information an employee obtains through years of experience and information an employee obtains solely through an employer:

> [Courts] recognize the distinction between the case of an employee, who leaves one employer and uses his own faculties, skill and experience in the establishment of an independent business or in the service of another, and the case of one who uses confidential information, secured solely through his employment, to the harm of his previous employer.

*Id.* at 697.  Moreover, "[c]onfidential information of an employer . . . loses any protection to which it may have been entitled after it has been merged into the employee's own faculties, skill and experience."  *Id.* (citation and internal quotation marks omitted); *see also Utah Med. Prods., Inc. v. Clinical Innovations Assocs.*, 79 F. Supp. 2d 1290, 1312–13 (D. Utah 1999) (finding it "necessary" for a plaintiff to separate its trade secret "from the general skill and knowledge possessed by [the defendants]"), *aff'd*, 251 F.3d 171 (Fed. Cir. 2000).  Thus, "[t]here must be a delineation between the general knowledge and experience of the employee and the trade secrets of the employer."  *Microbiological Research*, 625 P.2d at 697.  CDC makes no attempt to delineate between the two here.

¶24    Further, the standard is not "'whether the information is generally known and readily ascertainable to the general public, but based on the defendant['s] knowledge and experience, whether the information was known or ascertainable to [the defendant.]'"  *USA Power, LLC v. PacifiCorp*, 2010 UT 31, ¶ 44, 235 P.3d 749 (alterations in original) (quoting *Utah Med. Prods.*, 79 F. Supp. 2d at 1312).  The standard therefore takes into account the relevant experience and knowledge of the specific defendants.  In

regard to developing pricing information for a restoration bid, both Allen and Carsey had substantial experience and knowledge. Allen worked as a project manager, coordinator, and director at Kennecott for twenty-eight years. As project manager, Allen supervised Kennecott's various contractors and had access to and knowledge of their pricing information. As the trial court stated, Allen "lived and worked" this type of pricing information. Carsey worked as a laborer and a foreman for CDC for almost twenty years. In those capacities, Carsey obtained knowledge regarding how many hours and how much equipment was necessary to perform restoration work at Kennecott and the pricing information for both. He helped CDC's estimators determine the requisite hours and equipment necessary to formulate a pricing structure for CDC's bids. More specifically, he helped Midgely estimate the number of hours required to perform the Project, and what equipment was needed. And Midgely testified that Carsey "had good knowledge of what it took to do the project out [at Kennecott]."

¶25    Moreover, the equipment rates contained in the PPA were not just readily ascertainable by Carsey and Allen, but were also readily ascertainable by the public. Here, the testimony shows that the equipment rates could be ascertained simply by calling equipment rental companies on the phone. Michael Lasater testified that he obtained some of the equipment rates for Tradesmen's PPA by doing just that. Midgely confirmed that calling rental equipment companies is a good way to research equipment pricing information.

¶26    Where information alleged to be a trade secret can be readily ascertained by performing a basic research task, the information does not qualify as a trade secret. For instance, in *Microbiological Research*, the court held that the plaintiff's customer list was not a trade secret, in part because "[m]ost of the customers['] . . . location[s] and identit[ies] . . . were readily accessible through public sources and trade journals." *Microbiological Research Corp. v. Muna*, 625 P.2d 690, 700 (Utah 1981). Similarly, in *Medspring Group, Inc. v. Feng*, 368 F. Supp. 2d 1270 (D. Utah 2005), the court held that the identities of the plaintiff's customers were readily ascertainable within the public domain and, thus, not trade secrets because a "simple internet search" for the product that the plaintiff marketed yielded some of the plaintiff's customers' identities. *See id.* at 1278–79. The court also held that the plaintiff's "method of classifying and defining" its product to obtain FDA approval was not a trade secret because that process was readily available on a public website. *See id.* at 1277. The method was therefore "a public process" and not a trade secret. *See id.* Phoning rental equipment companies and asking their rental rates is similar to performing an internet search or checking trade

journals or other public resources. Information obtained through such a process is readily ascertainable by the public.

¶27    In sum, we conclude that the trial court correctly ruled that, even viewed in the light most favorable to CDC, the evidence fell short of demonstrating a genuine issue of material fact as to the first element of the statutory definition of a trade secret. Accordingly, we affirm the trial court's ruling that CDC's labor and equipment pricing information is not, as a matter of law, entitled to trade secret protection.

B. CDC's Bid Information

¶28    CDC also contends that the trial court erred in ruling that CDC had produced no evidence that Tradesmen, Carsey, and Allen used CDC's bid information, including its actual bid amount, in formulating Trademen's own bid on the Project, and thus no genuine issue of material fact existed.[2] Analytically, this claim presents something of a mirror image of the claim based on CDC's pricing information.[3] The question with respect to CDC's pricing information was not whether CDC presented evidence that Tradesmen used CDC's pricing information (it did), but whether CDC presented evidence that its pricing information qualified as a trade secret. In contrast, the question with respect to CDC's bid information was not whether CDC presented evidence that the bid information qualified as a trade secret (it did), but whether CDC presented evidence that Tradesmen used the bid information in formulating its own bid.

¶29    The trial court ruled that CDC had failed to adduce sufficient evidence to create a genuine issue of material fact as to whether Tradesmen, Carsey, or Allen "ever saw or made use of [CDC's] bid for the project." CDC challenges this ruling on appeal,

---

[2]The pricing information contained in CDC's PPA is not job-specific, but is a list containing, for example, hourly, daily, and weekly costs to rent certain pieces of equipment. In contrast, we understand "bid information" to mean the contents of CDC's bid on the Project, including the total bid amount.

[3]CDC presents distinct claims on appeal based on misappropriation of its pricing information and misappropriation of its bid information. In fact, the claims appear in different subsections of its brief.

arguing in particular that the trial court failed to draw all reasonable inferences of fact in favor of CDC.

¶30    A jury can infer misappropriation of a trade secret from circumstantial evidence. *See USA Power, LLC v. PacifiCorp,* 2010 UT 31, ¶ 50, 235 P.3d 749.  Consequently, "presentation of circumstantial evidence may create a genuine issue of material fact foreclosing summary judgment." *Id*. ¶ 65 (citing *Regan-Touhy v. Walgreen Co.,* 526 F.3d 641, 651 (10th Cir. 2008)); *cf. id.* ("[I]t may be difficult for a plaintiff to produce direct evidence that his or her attorney disclosed or misused confidential information.").  Furthermore, on summary judgment a non-moving party may controvert the movant's statements of fact "by presenting to the court the contrary inferences to be made from those facts." *Id*. ¶ 38.  The trial court is then required to determine whether the inferences are reasonable. *Id*. ¶ 37.

¶31    CDC contends that the evidence shows that Carsey helped formulate both bids. It points to Midgley's deposition as evidence that Carsey was involved with "every aspect of [CDC's] bid."  Midgley, a managing member of CDC, testified in his deposition that Carsey assisted him in "assembling estimated labor and manpower" for the bid; helped him "estimate the amount of manpower and time needed to accomplish the project and, in some instances, what equipment [CDC] would need"; and, at least indirectly, "help[ed] with the totals."  At the same time, Michael Lasater, Allen's partner at Tradesmen, stated in his deposition that, the night before the bid was due, Carsey and Allen were at Tradesmen's offices working on Tradesmen's bid.

¶32    In addition, CDC argued in the trial court that the facts support a reasonable inference that Tradesmen, Carsey, and Allen actually knew the "exact numbers" on the bid, "or very close."  The trial court seemed to agree that "the bid is, in fact, a trade secret," but saw "absolutely no evidence the bid information itself was used."  CDC does not claim direct evidence that Tradesmen, Carsey, and Allen knew the amount of CDC's bid—"or very close"—but asserts that this proposition may reasonably be inferred from the depositions on file.  In addition to the evidence summarized above, CDC relies on the fact that Tradesmen raised its bid on the Project by approximately $10,000 at the last minute.  CDC argues that this testimony supports the inference "that Allen knew he could increase the bid approximately $10,000 because [he] knew the revised Tradesmen[] bid would still be below CDC's bid."

¶33    In response, the Tradesmen Defendants rely on the conclusory statement of the trial court that "there is no competent evidence that any of the defendants knew the actual bid amount of CDC."  They also rely on a statement in Carsey's own deposition that Midgley "would hand me a package and say, 'this is confidential'"; although Carsey did not know what was in the packages because they were sealed, he believed they were invoices.  However, this statement may not be about pricing information or bids on the Project at all; the line of questioning begins with counsel asking, "*With the exception of the E-bay*, do you remember any prebid walk-throughs during the 2003 to 2005 time period at the Kennecott refinery?" (Emphasis added.)  The Tradesmen Defendants also note that Carsey and Lindsey Mounteer testified in their depositions that Carsey had no involvement in Tradesmen's bid on the Project.

¶34    Although factually distinguishable, this issue is similar in certain respects to the one presented in *USA Power*.  There, the trial court "granted summary judgment to [the defendant] on [the plaintiff's] misappropriation of trade secrets claim because it determined that [the plaintiff] failed to provide sufficient evidence that [certain information] was a trade secret or that [defendant] more likely than not misappropriated any possible trade secrets."  *USA Power*, 2010 UT 31, ¶ 24.  The supreme court reversed on the ground that "a jury could reasonably infer that [the defendant] misappropriated [the plaintiff's] alleged trade secret . . . ."  *Id*. ¶ 52.  It was in this context that the supreme court observed that circumstantial evidence may be adequate to overcome summary judgment. *See id*. ¶ 50.

¶35    The evidence of use offered by CDC here is entirely circumstantial.  Carsey assisted Midgley in formulating CDC's bid, including assembling labor estimates; estimating the equipment and time needed to accomplish this particular project; and helping with the bid totals.  He then spent the night before the bid was due working with Allen on Trademen's bid.  Especially in light of the principles stated by our supreme court in *USA Power*, we conclude that this evidence is sufficient to establish a genuine issue of material fact and thus to survive summary judgment. *Cf. Anderson Dev. Co. v. Tobias*, 2005 UT 36, ¶ 33, 116 P.2d 323 ("Although the evidence in support of this element is thin, we conclude that it is nevertheless sufficient to withstand summary judgment.").[4]

---

[4]The Tradesmen Defendants advance another argument that would apply to

(continued...)

## II. Preemption

¶36     CDC contends that the trial court erred in dismissing its claims for breach of fiduciary duty, intentional interference with prospective economic relations, and civil conspiracy.  The trial court ruled that the claims for intentional interference and civil conspiracy are preempted by the UTSA; the Tradesmen Defendants argue that the claim for breach of fiduciary duty—which the court dismissed on its merits—is also preempted.

¶37     With three delineated exceptions, the UTSA displaces, or preempts, conflicting state remedies based on the misappropriation of a trade secret:

> (1) Except as provided in Subsection (2), this chapter displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret.
> (2) This chapter does not affect:
>> (a) contractual remedies, whether or not based upon misappropriation of a trade secret;
>> (b) other civil remedies that are not based upon misappropriation of a trade secret; or
>> (c) criminal remedies, whether or not based upon misappropriation of a trade secret.

Utah Code Ann. § 13-24-8 (2009).

---

[4](...continued)
CDC's claims of misappropriation based both on pricing information and bid information.  The argument goes to causation.  They argue that Tradesmen won the bid primarily on the strength of Carsey's "experience and concern for safety," not on the relative bid amounts of the parties.  The Tradesmen Defendants' cursory argument does not convince us that summary judgment was appropriate on this claim.  Indeed, the issue of causation appears to present a genuine issue of material fact for trial.

¶38     This appeal asks whether CDC's non-UTSA remedies are "based upon misappropriation of a trade secret." *See id*. CDC contends that a state tort claim conflicts with—and thus is preempted by—the UTSA only if it is based solely on information actually ruled a "trade secret" under the UTSA. We must therefore determine whether the UTSA preempts claims based on the misappropriation of information that does not meet the UTSA's definition of "trade secret." This appears to be an issue of first impression in this jurisdiction. *See Russo v. Ballard Med. Prods.*, No. 2:05 CV 59, 2006 WL 2345868, at *9 (D. Utah Aug. 10, 2006) (stating that "[t]here are no published cases in Utah that address the preemptive effect of the UTSA").

¶39     "Under our rules of statutory construction, we look first to the statute's plain language to determine its meaning." *Sindt v. Retirement Bd.,* 2007 UT 16, ¶ 8, 157 P.3d 797 (citation and internal quotation marks omitted). In addition, "[w]e read the plain language of the statute as a whole, and interpret its provisions in harmony with other statutes in the same chapter and related chapters." *Li v. Enterprise Rent-A-Car Co. of Utah*, 2006 UT 80, ¶ 9, 150 P.3d 471 (alteration in original) (citation and internal quotation marks omitted). Furthermore, "[o]ne of the cardinal principles of statutory construction is that [we] will look to the reason, spirit, and sense of the legislation, as indicated by the entire context and subject matter of the statute dealing with the subject." *Miller v. State*, 2010 UT App 25, ¶ 12, 226 P.3d 743 (alterations in original) (citation and internal quotation marks omitted). In addition to these general rules of interpretation, the Utah UTSA itself contains an interpretive mandate: "This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of the chapter among states enacting it." Utah Code Ann. § 13-24-9. Consistent with this mandate, we review how other adopting jurisdictions have construed the UTSA's preemption provision.[5]

¶40     The UTSA was promulgated to address concerns about the "'uneven'" development of trade secret law and to combat the resulting "'undue uncertainty concerning the parameters of trade secret protection, and the appropriate remedies for misappropriation of a trade secret.'" *BlueEarth Biofuels, LLC v. Hawaiian Elec. Co.*, 235 P.3d 310, 313 (Haw. 2010) (quoting Prefatory Note to Uniform Trade Secrets Act, 14 U.L.A. 531 (2005)). It accordingly sought to provide "'unitary definitions of trade secret

---

[5]Forty-five states, the District of Columbia, and one territory have adopted the UTSA. *See* Utah Code Ann. § 13-24-9 amend. notes (2009).

and trade secret misappropriation, and a single statute of limitations for the various . . . theories of noncontractual liability utilized at common law.'" *K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.*, 90 Cal. Rptr. 3d 247, 260 (Cal. Ct. App. 2009) (quoting Prefatory Note to Uniform Trade Secrets Act, 14 U.L.A. 537–38 (1980)). The drafters wanted to "assure businesses that their efforts will be tested against the same measure of care in every state." Uniform Law Commission, *Why States Should Adopt UTSA*, http://www.nccusl.org/Narrative.aspx?title=Why%20States %20Should%20Adopt%20UTSA (last visited Feb. 21, 2012).

¶41    Courts interpreting the preemption provision have thus declared that its purpose "is to preserve a single tort action under state law for misappropriation of a trade secret." *Mortgage Specialists, Inc. v. Davey*, 904 A.2d 652, 663 (N.H. 2006) (citation and internal quotation marks omitted); *see also Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d 943, 948 (W.D. Mich. 2003) (stating that "the purpose of the UTSA was to 'codify all the various common law remedies for theft of ideas' and that 'plaintiffs who believe their ideas were pilfered may resort only to the [U]TSA'" (citation omitted)); *Smithfield Ham & Prods. Co. v. Portion Pac, Inc.*, 905 F. Supp. 346, 348 (E.D. Va. 1995) (stating that the preemption provision's purpose is "to prevent inconsistent theories of relief for the same underlying harm by eliminating alternative theories of common law recovery [that] are premised on the misappropriation of a trade secret"); *BlueEarth Biofuels*, 235 P.3d at 322 (stating that the UTSA "evince[s] the goal of eliminating uncertainty and creating a single action for misappropriation of a trade secret").

¶42    Because the UTSA sought to streamline trade secret law so that causes of action based on misappropriation of information must be brought under the UTSA, permitting a cause of action for the use of information that does not meet the statutory definition of trade secret "would undermine the uniformity and clarity that motivated the creation and passage of the [UTSA]." *Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp. 2d 784, 789 (W.D. Ky. 2001). Accordingly, "the UTSA's preemption provision has generally been interpreted to abolish all free-standing alternative causes of action for theft or misuse of confidential, proprietary, or otherwise secret information falling short of trade-secret status (e.g., idea misappropriation, information piracy, theft of commercial information, etc.)." *Hauck Mfg. Co. v. Astec Indus., Inc.*, 375 F. Supp. 2d 649, 655 (E.D. Tenn. 2004) (collecting cases); *see also Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 649 F. Supp. 2d 702, 720–22 (N.D. Ohio 2009) (same); *Mortgage Specialists*, 904 A.2d at 663–64 (collecting cases and noting that "the weight of

authority among courts that have considered the preemption provision" is that it "preempts claims that are based upon the unauthorized use of information, regardless of whether that information meets the statutory definition of a trade secret"); Mark A. Lemley, *The Surprising Virtues of Treating Trade Secrets as IP Rights*, 61 Stanford L. Rev. 311, 345–46 (2008) ("[A] plaintiff who complains of the defendant's use of its information, but who cannot prove that the information is secret, should not be able to rely on one of these torts (or any other common law variants) to bypass the requirement that it prove secrecy.").[6]

¶43     However, "a minority of courts . . . have held that common law and statutory claims are not preempted by the UTSA if they involve information that does not meet the statutory definition of a trade secret." *Mortgage Specialists*, 904 A.2d at 663 (collecting cases but rejecting them as contrary to the history, purpose, and majority view of the UTSA).  Heretofore, rulings from the Utah federal district court have been divided, but have favored this view of the Utah UTSA.  *Compare ClearOne Commc'ns, Inc. v. Chiang*, No. 2:07-cv-37 TC, 2007 WL 4376125, at *4 (D. Utah Dec. 13, 2007) (following the minority view), *and Russo v. Ballard Med. Prods.*, No. 2:05 CV 59, 2006 WL 2345868, at *9 (D. Utah Aug. 10, 2006) (same), *with Iostar Corp. v. Stuart*, No. 1:07-CV-133, 2009 WL 270037, at *6–7 (D. Utah Feb. 3, 2009) (apparently following the majority view).

¶44     One criticism of the majority view is that it would permit a plaintiff's claim to be "preempted by a statute that grants him no cause of action."  *Russo*, 2006 WL 2345868, at *9.  That is, a plaintiff may be left unable to prove trade secret status under the UTSA, yet barred by it from proceeding on any other theory.  As we read the preemption provision of the UTSA, this is precisely its intended result.  A contrary approach would "'render the statutory preemption provision effectively meaningless,'" leaving prior law untouched and converting an exclusive remedy into "'just another basis for recovery.'"  *BlueEarth Biofuels*, 235 P.3d at 322 (quoting Robert Unikel, *Bridging the "Trade Secret"*

---

[6]Moreover, a majority of jurisdictions considering the question have held that a court "need not first determine whether the information that [the plaintiff] alleges was misappropriated constitutes a trade secret before determining whether [the UTSA] displaces [the plaintiff's] common-law claims." *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 649 F. Supp. 2d 702, 721–22 (N.D. Ohio 2009) (collecting cases).

*Gap*, 29 Loy. U. Chi. L.J. 841, 888 (1998)); *see also Hauck Mfg.*, 375 F. Supp. 2d at 655; *Mortgage Specialists*, 904 A.2d at 663. "Although this result may seem harsh," the UTSA's preemption provision does "permit individuals and corporate entities to protect their valuable commercial information contractually, regardless of whether such information meets the statutory definition of 'trade secret.'" *Mortgage Specialists*, 904 A.2d at 664 (emphasis omitted); *see also* Utah Code Ann. § 13-24-8(1) (2009) ("This chapter does not affect . . . contractual remedies, whether or not based upon misappropriation of a trade secret . . . .").

¶45    In light of the purpose of the UTSA and the statutory mandate, which dictates that we construe it "to make uniform [trade secret] law . . . among states enacting it," *see* Utah Code Ann. § 13-24-9, we join the majority of courts that have addressed this issue and hold that the UTSA preempts claims based on the unauthorized use of information, irrespective of whether that information meets the statutory definition of a trade secret.

¶46    However, CDC maintains that its non-UTSA claims survive even if claims based on information that does not meet the statutory definition of trade secret are preempted, because its claims are "not solely based on Defendants' purported misappropriation of trade secrets." Defendants respond that CDC's remaining claims are preempted because the claims "are dependent on the same facts as [the] misappropriation of trade secrets claim." Accordingly, we must determine the appropriate scope of the preemption provision.

¶47    Generally, courts addressing this issue have agreed that a preliminary examination of the facts underlying the non-UTSA claim is necessary to determine whether a claim is preempted. *See, e.g., Mortgage Specialists, Inc. v. Davey*, 904 A.2d 652, 665 (N.H. 2006) (collecting cases); *see also BlueEarth Biofuels, LLC v. Hawaiian Elec. Co.*, 235 P.3d 310, 316–17 (Haw. 2010) (noting that a majority of courts conduct a preemption analysis based on "the factual allegations underlying each claim" rather than the elements of the claims). Beyond that general agreement, courts have differed as to how those facts affect preemption. *See, e.g., BlueEarth Biofuels*, 235 P.3d at 317–19 (comparing cases). *But see Hauck Mfg. Co. v. Astec Indus., Inc.*, 375 F. Supp. 2d 649, 655–58 (E.D. Tenn. 2004) (noting that although "courts have stated the law in divergent manners," they have "appl[ied] those seemingly contrary standards in similar, if not identical, fashion"). For instance, some courts have held that all claims that are factually related to the alleged misappropriation are preempted. *See Powell Prods., Inc. v. Marks*, 948 F. Supp. 1469, 1474 (D. Colo. 1996) (collecting cases but ruling that preemption is only

appropriate where "other claims are no more than a restatement of the same operative facts which would plainly and exclusively spell out only trade secret misappropriation" (citation and internal quotation marks omitted)). Other courts have more narrowly held that claims are preempted only where "proof of a non-UTSA claim would also simultaneously establish a claim for misappropriation of trade secrets." *See Hauck Mfg.*, 375 F. Supp. 2d at 658.

¶48     In light of the preemption provision's purpose "to preserve a single tort action under state law for misappropriation of a trade secret," *see Mortgage Specialists*, 904 A.2d at 663, we conclude that a claim is preempted to the extent that it is based on factual allegations supporting a misappropriation of trade secrets or otherwise confidential information. *See id.* at 665. Under this standard, "if proof of a non-UTSA claim would also simultaneously establish a claim for misappropriation of trade secrets, it is preempted irrespective o[f] whatever surplus elements of proof were necessary to establish it." *Hauck Mfg.*, 375 F. Supp. 2d at 658. However, to whatever extent that a claim is "based upon wrongful conduct independent of the misappropriation of trade secrets" or otherwise confidential information, it is not preempted. *See Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d 943, 950 (W.D. Mich. 2003). This approach preserves the UTSA as the sole noncontractual civil remedy for misappropriation of a trade secret, while preserving tort, restitutionary, and other causes of action that "seek[ ] to remedy an injury caused not by the misappropriation of proprietary information, but by separate conduct." *See Diamond Power Int'l, Inc. v. Davidson*, 540 F. Supp. 2d 1322, 1345 (N.D. Ga. 2007).

¶49     Thus, we must review the facts underlying each of CDC's remaining claims to determine the extent to which each claim is based on misappropriation of information.

A.  Breach of Fiduciary Duty

¶50     The trial court rejected CDC's breach of fiduciary duty claim on the ground that CDC failed to demonstrate a genuine issue of material fact as to whether Carsey owed CDC a fiduciary duty. The trial court did not address the issue of whether CDC's breach of fiduciary duty claim was preempted by the UTSA. However, Carsey argued below, and continues to argue on appeal, that CDC's breach of fiduciary claim is preempted by the UTSA. "[A]n appellate court may affirm the judgment appealed from if it is sustainable on any legal ground or theory apparent on the record." *Bailey v. Bayles*, 2002 UT 58, ¶ 13, 52 P.3d 1158 (emphases, citation, and internal quotation marks omitted).

¶51    Whether an employee such as Carsey owed a fiduciary duty to his employer is unclear under Utah law. *See Prince, Yeates & Geldzahler v. Young*, 2004 UT 26, ¶ 22 n.2, 94 P.3d 179 ("We need not, and do not, decide today whether all 'mere employees' owe fiduciary duties to their employers to not compete with the employer's legitimate business interests."). However, we need not grapple with this issue here, as we agree with Carsey that CDC's breach of fiduciary duty claim is preempted by the UTSA.

¶52    Examination of the factual allegations underlying CDC's breach of fiduciary duty claim shows that this claim is based solely on theories of misappropriation or misuse of CDC's confidential information. In support of its breach of fiduciary duty claim, CDC avers that it provided Carsey "with access to [CDC's] confidential business information and Trade Secrets," and that Carsey owed CDC several fiduciary duties, including "a duty not to disclose CDC's Trade Secrets and confidential business information, a duty not to use CDC's Trade Secrets and confidential business information to compete unfairly with CDC, and a duty not to use CDC's Trade Secrets and confidential business information for the benefit of a new business." Accordingly, this claim is preempted by the UTSA in its entirety. *See, e.g., Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 649 F. Supp. 2d 702, 724 (N.D. Ohio 2009) (holding that UTSA preempted a breach of fiduciary duty claim because it was "solely dependent upon misappropriation-of-trade-secret facts"); *Frantz v. Johnson*, 999 P.2d 351, 357–58 & n.3 (Nev. 2000) (holding that UTSA preempted a breach of fiduciary duty claim because it was "completely dependent on the facts concerning misappropriation of trade secrets"); *Mortgage Specialists, Inc. v. Davey*, 904 A.2d 652, 668 (N.H. 2006) (holding that UTSA preempted a breach of fiduciary duty claim because the factual allegations supporting that claim involved only "the misappropriation of . . . information").

¶53    We therefore affirm the trial court's dismissal of this claim.

B.  Intentional Interference with Economic Relations

¶54    Next, CDC contends that the trial court erred in dismissing its cause of action based on intentional interference with prospective economic relations. Looking at the factual allegations relied upon to prove this claim, we conclude that it is preempted by the UTSA. Under *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293 (Utah 1982), to establish a claim for intentional interference with prospective economic relations, a plaintiff must show "(1) that the defendant intentionally interfered with the plaintiff's

existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff." *Id.* at 304.

¶55 The trial court ruled that CDC failed to present evidence sufficient to establish a genuine issue of material fact as to whether Tradesmen, Carsey, or Allen acted for the predominant purpose of injuring CDC or acted by improper means not arising from "a factual episode that necessarily relies on the information at issue being a trade secret." Accordingly, the court ruled that the claim was preempted by the UTSA. CDC challenges only the court's ruling on the improper means prong. Inasmuch as improper purpose and improper means are alternative elements, CDC need not defeat both rulings to prevail on appeal. *Cf. id.* at 307 ("The alternative of improper purpose (or motive, intent, or objective) will support a cause of action for intentional interference with prospective economic relations even where the defendant's means were proper.").

¶56 CDC argues that its *Leigh Furniture* claim "can withstand summary judgment because it is not solely based on Defendants' purported misappropriation of trade secrets." CDC points out that Carsey and Allen both "engaged in deceptive behavior and misrepresented material facts." For instance, CDC notes that during the pre-bid walkthrough of the project at Kennecott, "Midgley specifically asked Carsey if he knew anything about Tradesmen," to which Carsey replied that "he did not know who they were," despite the fact that, at the time, Carsey was already a part owner in Tradesmen and had already been "elected as Tradesmen's vice-president and project developer." In addition, during the bidding process, Allen "hid[] his relationship with Tradesmen from Kennecott," "even [going] so far as to send an email to" a Kennecott manager denying that he "kn[e]w anything about Tradesmen." CDC also alleges that Carsey and Allen's actions raised conflict of interest issues. For instance, CDC notes that Carsey helped prepare Tradesmen's bid the day after he helped prepare CDC's bid and that Carsey was a part owner of Tradesmen while still working for CDC. CDC also notes that "Allen's association with Kennecott . . . during the competitive bidding process raised serious conflict of interest issues."

¶57 However, CDC's burden at trial would be to show that the interference by improper means caused CDC injury. *See id.* at 304. CDC does not allege this, much less demonstrate a genuine issue of material fact concerning it. CDC cites evidence that, had Kennecott's supervisors known of Carsey and Allen's involvement with Tradesmen, that information "would have definitely brought some concerns," "would have created an issue," and would have raised conflict of interest issues. But CDC

points to no evidence that such conduct alone caused CDC to lose the Project bid or suffer any other material injury. Viewed in the light most favorable to CDC, the evidence supports the allegation that Carsey and Allen did engage in deceptive and deceitful acts. But all were done to facilitate Tradesmen's preparation of the winning bid using CDC's pricing information. Accordingly, we agree with the trial court that, without reliance on the misuse of confidential information, CDC's claim for intentional interference with economic relations fails as a matter of law and, consequently, is preempted by the UTSA.

C. Civil Conspiracy

¶58    Finally, CDC contends that the trial court erred by ruling that its claim for civil conspiracy was preempted due to CDC's failure "to present evidence that is sufficient to establish a genuine issue of material fact for any claim that may serve as a basis for civil conspiracy that does not arise from a factual episode that necessarily relies on the information at issue being a trade secret."

¶59    "'To prove civil conspiracy, five elements must be shown:  (1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof.'" *Peterson v. Delta Air Lines, Inc.*, 2002 UT App 56, ¶ 12, 42 P.3d 1253 (additional internal quotation marks omitted) (quoting *Alta Indus. v. Hurst*, 846 P.2d 1282, 1290 n.17 (Utah 1993)). To establish "one or more unlawful, overt acts," CDC relies on the individual claims addressed above. These are all based on the same factual allegations as CDC's misappropriation of trade secrets claim. Accordingly, for reasons explained above, we conclude that CDC's claim for civil conspiracy, like its claims for breach of fiduciary duty and interference with economic relations, is displaced by the UTSA. We therefore affirm the trial court's ruling on this issue.

CONCLUSION

¶60    With respect to its claim for misappropriation of pricing information, CDC finds itself boxed in by the UTSA. CDC lacks evidence that the pricing information it claims Tradesmen, Allen, and Carsey misappropriated qualifies as a trade secret under the UTSA. Yet that information is enough like a trade secret that CDC's non-UTSA claims are preempted by the UTSA. The UTSA does not displace civil remedies not based

upon misappropriation of trade secrets, nor does it displace contractual remedies, whether or not based upon misappropriation of trade secrets.  However, CDC's non-UTSA causes of action fit neither category.  They are, accordingly, preempted.

¶61    However, CDC's claim for misappropriation of bid information stands on different footing.  Summary judgment was granted not on the basis that this information failed to qualify as a trade secret—the trial court opined that it probably did—but that CDC failed to bring forth sufficient evidence to create a genuine issue of material fact as to whether Tradesmen, Allen, and Carsey had misappropriated it.  While the evidence of use was circumstantial, we conclude that it was sufficient for this claim to survive summary judgment.  We therefore reverse on this issue.[7]

¶62    Affirmed in part, reversed in part, and remanded for further proceedings.

_____
J. Frederic Voros Jr.,
Associate Presiding Judge

-----

¶63    WE CONCUR:

_____
Carolyn B. McHugh,
Presiding Judge

_____

_____

[7]Our ruling is not intended to prevent Defendants from contending at trial that CDC's bid information was not a trade secret, should they disagree with the trial court on that point.

Gregory K. Orme, Judge