**2022 UT App 90**

# THE UTAH COURT OF APPEALS

GENERAL WATER TECHNOLOGIES INC.,
*Appellee,*
*v.*
NATHAN VAN ZWEDEN, DAVE ROTZLER, AND
MED WATER SYSTEMS LLC,
*Appellants.*

Opinion
No. 20200414-CA
Filed July 14, 2022

Second District Court, Farmington Department
The Honorable David M. Connors
No. 160700809

Troy L. Booher, Dick J. Baldwin, Taylor Webb,
Bruce M. Pritchett Jr., Jonathan R. Rudd, and
Dusten L. Heugly, Attorneys for Appellants

Sean N. Egan, Attorney for Appellee

JUSTICE DIANA HAGEN authored this Opinion, in which JUDGES
DAVID N. MORTENSEN and RYAN D. TENNEY concurred.[1]

HAGEN, Justice:

¶1    To establish a trade secret misappropriation claim, the plaintiff must show that the defendant misappropriated information that meets the definition of a trade secret under the Utah Uniform Trade Secrets Act (the UUTSA). *See* Utah Code

---

1. Justice Diana Hagen began her work on this case as a judge of the Utah Court of Appeals. She became a member of the Utah Supreme Court thereafter and completed her work on the case sitting by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 3-108(4).

Ann. § 13-24-2(4) (LexisNexis 2013). Whether information qualifies as a trade secret is ultimately a question for the fact finder. *See USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 46, 372 P.3d 629. In this case, a jury found Appellants Nathan Van Zweden and Dave Rotzler liable for misappropriating two purported trade secrets held by General Water Technologies Inc.: (1) the design of a water filtration system and (2) pricing-related information. We hold that there was sufficient evidence to support the jury's determination as to the design secret, but not the pricing secret. Therefore, we affirm in part and reverse in part.

BACKGROUND[2]

¶2    General Water Technologies Inc. (Gen Water) and Med Water Systems LLC (Med Water) are two Utah-based companies that each supply medical-grade water filtration systems to healthcare facilities throughout the country. Van Zweden and Rotzler are former employees of Gen Water who left for Med Water in late 2014 and 2015, respectively. Following their departures, Gen Water learned that one of its largest clients had decided to switch providers to Med Water. Gen Water then sued Van Zweden, Rotzler, and Med Water for trade secret misappropriation. After a jury found Van Zweden and Rotzler liable, the district court enjoined them from using Gen Water's trade secrets.

---

2. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 8 n.3, 372 P.3d 629 (cleaned up).

*History*

¶3     Gen Water produces and sells water filtration systems for use in medical laboratories. The machine at issue in this case produces Type I grade reagent water—water suitable for use in medical analyzers. As one of Gen Water's salesmen, Van Zweden traveled the country marketing the machine to various healthcare facilities. And although Rotzler had originally been hired as a part-time accountant, Gen Water later trained him to assemble its machines and install them at customers' facilities. Together, Van Zweden and Rotzler's experience at Gen Water gave them "a leg up" once they left the company for Med Water and began competing for potential clients.

¶4     One of Gen Water's larger clients, Mayo Clinic, had purchased "a little over [twenty]" of Gen Water's machines for its "locations in Wisconsin and Minnesota." Mayo Clinic had also contracted Gen Water to provide maintenance services on the purchased machines for an annual fee. Shortly before the contract term had run, however, Van Zweden began corresponding with Mayo Clinic's representatives—this time on Med Water's behalf. He indicated that Med Water could provide the same maintenance services but at a significant discount. Mayo Clinic subsequently notified Gen Water of its intention not to renew the contract, then signed with Med Water.

¶5     Gen Water discovered the correspondence and promptly filed suit against Van Zweden, Rotzler, and Med Water, requesting damages and an injunction under the UUTSA. The gist of the allegations was that Med Water had consistently underbid Gen Water to potential clients and that it did so by relying on information that Van Zweden and Rotzler had acquired while working for Gen Water. This included Gen Water's "confidential and proprietary pricing and bid strategy information." Gen Water also alleged that the defendants were marketing a water filtration system that was "nearly identical" to Gen Water's machine.

*Nondisclosure Issues*

¶6 A lengthy discovery period ensued. But several years into the litigation, Gen Water had yet to disclose a computation of its damages. The defendants therefore moved to exclude all evidence of Gen Water's damages for untimely disclosure—a request granted by the district court. Gen Water could therefore pursue only injunctive relief. *See InnoSys, Inc. v. Mercer*, 2015 UT 80, ¶ 34, 364 P.3d 1013 (recognizing "a right under the [UUTSA] to the issuance of an injunction without regard to proof of measurable economic injury to the plaintiff").

¶7 The defendants later took issue with Gen Water's description of its trade secrets and, less than one month before trial, moved to exclude "evidence of [Gen Water's] unspecified trade secrets." By that point, Gen Water had seemingly clarified that there were two alleged trade secrets: (1) "its filtration system" and (2) "its pricing information, its strategies for maintaining and soliciting current and prospective customers including pricing and bidding information." Even so, the defendants argued that Gen Water had not timely disclosed "any witness or any document that would specifically identify what exactly [its] trade secrets" were. They also complained about Gen Water's lack of "specificity as to what is secret about its pricing, and . . . what is secret about its purification/filtration system." Gen Water opposed the motion and, by the time the defendants filed their reply memorandum, eight days remained before trial. The defendants separately objected to Gen Water's pretrial disclosures, arguing, similarly, that "[n]ot a single one of [Gen Water's] witnesses was ever disclosed as testifying at trial about specifically identified trade secrets."

¶8 These issues were addressed on the first day of trial, after yet another nondisclosure issue arose. Gen Water had arrived with a model of its water filtration system, which it intended to use as a demonstrative exhibit. The defendants objected on the

basis that it, too, had not been disclosed. Gen Water countered that the nondisclosure was harmless, in part, because the defendants could just as easily "bring in their own machine" for demonstrative purposes. The district court ruled, "I'm going to allow the machine to be shown . . . . If the defendants wish to bring their own machine at some point and point to it, they may do the same thing."

¶9 The court then addressed the defendants' prior nondisclosure objections. "[W]e'll just take it on a . . . question-by-question basis. If there's an appropriate objection, you'll raise it at that time, and we'll deal with it." The court added that, "to the extent there are going to be objections to specific testimony based on specific nondisclosure," it would reserve ruling on those objections until they were raised at trial.

¶10 But the defendants raised no such objection to the evidence Gen Water actually presented at trial. On day two of trial, they did ask the court to exclude two potential witnesses identified for the first time in Gen Water's pretrial disclosures. *See* Utah R. Civ. P. 26(a)(5)(A)(i) ("A party must . . . separately identify[] witnesses the party will call and witnesses the party may call."). Gen Water indicated that it had not intended to call either individual as a witness, so the court excluded them. Gen Water then presented significant witness testimony and physical evidence during its case-in-chief, with no further nondisclosure objections by the defendants. At one point, for instance, Gen Water moved to admit a set of computer-aided drawings of its water filtration system. When the court asked the defendants if they had any objections to its admission, the defendants said, "No objection."

*Gen Water's Evidence*

¶11 At trial, Gen Water's trade secrets were defined in the jury instructions as follows: (1) "the design of [the] water purification machine" (the design secret) and (2) "pricing and bidding

information" (the pricing secret). As witnesses, Gen Water called several of its representatives to testify, including one of its technicians, its management consultant, and a billing specialist.

¶12 The technician and consultant testified about the design secret. Collectively, they testified that Gen Water was formed in 2001 and, at that time, had primarily distributed a German company's product. Although Gen Water had toyed with developing its own machine for several years, it began seriously doing so in 2008, after the German company raised its prices. Gen Water then hired an inventor to build a prototype based on "some drawings" of what it envisioned its design would look like, using "half of an SG box"—the German company's product—"just to get the idea." The inventor's prototype was not to Gen Water's satisfaction, and the working relationship ended after the inventor was unable to resolve its issues. Gen Water continued to develop the product on its own, working, at times, through "trial and error." In total, it took "approximately two years" before Gen Water's machine was ready to be sold.

¶13 The final product consisted of a "head" and a "reservoir." It housed a "seven-step [filtration] process" for producing Type I water and was "largely assembled" using component parts "from third party suppliers." The technician and consultant both pointed to various parts of Gen Water's demonstrative exhibit while testifying. And when discussing the internal components of the machine, Gen Water's witnesses opened the demonstrative exhibit using an ordinary Phillips-head screwdriver.

¶14 The technician and consultant identified at least two ways in which Gen Water's machine was preferable to competitors' systems. First, its internal components were arranged to optimize the size of the machine. As the technician testified, "Laboratories generally don't have a lot of room. So we made it as small as we could." Later, when challenged by defense counsel regarding whether the machine's individual components were trade secrets,

the technician responded that "[t]he way they are put together is the secret." The consultant added, "[T]he key element of our machine is the size . . . . The way we put stuff in it, it was on purpose." Indeed, "the major difference" between Gen Water's machine and the inventor's prototype was "the way that everything [was] mounted in the machine."

¶15    Second, Gen Water designed the machine "for longevity." The technician testified,

> [W]e were trying to make . . . a machine that we didn't have to visit very often. It was very reliable. The customer could change the parts on it if they needed. It was very important for them. If their water machine goes down, then their analyzer doesn't work. And, you know, if it's in an emergency room, it could put them in big trouble. So we tried to make it as easy to fix as possible. . . . These filters in the front, . . . the customer can change those.

Similarly, the consultant explained that other "machines in the field . . . were not very reliable . . . . We only wanted to see our customers once a year. We didn't want to see them every two or three months. So we designed it into the machine for longevity to last that long." The technician added that, once a machine had "run its natural life," the client would generally return it to Gen Water for disposal.

¶16    The technician and consultant also testified about what Gen Water had done to ensure the secrecy of the machine's design. The consultant testified that the company kept the schematics for its machine locked in a safe and that only he knew the combination. When questioned by defense counsel, the technician acknowledged that Gen Water had a photo of its machine on the company's website—taken from the front with the

cabinet-door open. But even though the photo displayed a portion of the machine's interior, the technician stated that it was impossible to reconstruct the machine based solely on that limited view. "It doesn't show where anything goes . . . . Just looking at the picture would be comparable to looking at a dashboard on a car and be[ing] able to wire the speedometer . . . ."

¶17 Finally, the technician and consultant testified that Med Water marketed a machine that was essentially the same as Gen Water's. By marketing an identical product to Gen Water's machine, Med Water had effectively forced Gen Water "to compete against [itself]" when vying for customers.

¶18 For his part, the billing specialist testified about the pricing secret. The billing specialist said that Gen Water sold its product "to labs and hospitals across the country," working "through analyzer [and] sales representatives." Like Mayo Clinic, Gen Water's clients were ordinarily "billed on an annual basis after the initial cost [of] the [machine] itself," for "re-certification and continuation of the warranty," as well as "for any filters that they might have used throughout the year." Accordingly, with each potential client, the billing specialist would generate a quote that reflected both the cost of the machine and the annual costs.

¶19 When asked to identify the "information that Gen Water uses for sales that it keeps secret," the billing specialist responded that such information included "the pricing of [Gen Water's] system itself" and "the pricing on the annual re-certification and warranty continuation." Gen Water's "pricing" was "not on [its] website," and, to the billing specialist's knowledge, were someone to call and ask about pricing, Gen Water would not "give them that information." But on account of Van Zweden's position at Gen Water, he had "[o]n numerous occasions . . . request[ed] information about a particular client." In turn, the billing specialist had "emailed him a complete client list, which

include[d] the pricing of the annual re-certification of each location."

¶20 Pressed on how exactly Gen Water had developed the "prices for the machines and the services," the billing specialist testified as follows:

> It's a combination of finding all the costs of all the components that go into the system, and determining . . . from there what the final cost of the system is. We also have shipping costs. We have costs of sending an individual out to the lab, you know, plane fare, hotel, car, those types of things. And then their time to put the system in as well.

He later clarified, however, that Gen Water charged "a standard price" for its "water systems and . . . annual maintenance contracts." Gen Water's prices did not change from "one location versus the other"; only its profit margin did. And because the billing specialist merely generated quotes using QuickBooks software, he could not speak to what "factors" Gen Water had used to arrive at its standard pricing.

*Jury Verdict and Post-Trial Motions*

¶21 At the close of Gen Water's case-in-chief, the defendants moved for a directed verdict, arguing that Gen Water had presented insufficient evidence to support the existence of its trade secrets under the UUTSA. The district court denied the motion and, at the end of trial, the jury concluded that Gen Water had established the existence of both of its trade secrets. The jury further found that those trade secrets had been misappropriated by Van Zweden and Rotzler, but not by Med Water. Consequently, the district court permanently enjoined only Van Zweden and Rotzler from using Gen Water's trade secrets.

¶22    The defendants filed two post-trial motions, a motion for judgment notwithstanding the verdict (JNOV), and a motion to clarify the scope of the injunction. The motion for JNOV contained the same arguments that Van Zweden and Rotzler now make on appeal, including a challenge to the sufficiency of the evidence. The district court denied the motion for JNOV, reasoning that although "the evidence presented at trial was conflicting," there was sufficient evidence to support the jury's verdict.

¶23    In their motion to clarify, the defendants requested clarification "that the injunction does not apply to Med Water or anyone acting on behalf of Med Water"—including Van Zweden and Rotzler. The court denied the request but granted the motion "[o]n a limited basis." That is, the court "modif[ied] the language of the permanent injunction to more closely follow . . . [rule] 65A(d)" of the Utah Rules of Civil Procedure. Thus, under the modified injunction, "Van Zweden and Rotzler, their officers, agents, servants, employees, and attorneys, and any person in active concert or participation with Van Zweden or Rotzler who has notice or hereafter receives notice of this injunction, are . . . enjoined" from using either of Gen Water's trade secrets. The defendants appeal.

## ISSUES AND STANDARDS OF REVIEW

¶24    There are essentially three issues before us. First, Van Zweden and Rotzler argue that the district court erred by permitting Gen Water "to present . . . undisclosed evidence" at trial, despite their motion to exclude and pretrial objection. They separately argue that Gen Water should not have been able to use its untimely disclosed demonstrative exhibit. Because both arguments go to the district court's application of our discovery rules, we discuss them together. Although a district court's "interpretations of the Utah Rules of Civil Procedure are . . . reviewed for correctness, we grant district courts a great deal of

deference in matters of discovery and review discovery orders for abuse of discretion." *RJW Media Inc. v. Heath*, 2017 UT App 34, ¶ 18, 392 P.3d 956 (cleaned up).

¶25    Second, Van Zweden and Rotzler contend that "the district court erred in denying [their] motion for directed verdict and [JNOV]" because Gen Water "failed to . . . prove a protectable trade secret" at trial. We review the court's decisions in this regard for correctness. *See USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 34, 372 P.3d 629. "A directed verdict and a [JNOV] are justified only if, after looking at the evidence and all reasonable inferences in a light most favorable to the nonmoving party, the [district] court concludes that there is no competent evidence which would support a verdict in the nonmoving party's favor." *Id.* (cleaned up).

¶26    Finally, Med Water challenges the district court's refusal to clarify the scope of the permanent injunction as requested. "The granting or refusal of an injunction, whether temporary or permanent, . . . rests in the sound discretion of the [district] court . . . ." *Shell Oil Co. v. Stiffler*, 48 P.2d 503, 506 (Utah 1935). We therefore defer to the court's discretion unless its decision was premised on "an erroneous conclusion of law," or lacked "an evidentiary basis." *See RJW Media*, 2017 UT App 34, ¶ 18 (cleaned up).


ANALYSIS

I. Nondisclosure Issues

¶27    Van Zweden and Rotzler argue that "it was error for the district court to allow [Gen Water] to present its undisclosed evidence" at trial despite their prior motion to exclude and objection to Gen Water's pretrial disclosures. They argue that "[t]he district court also erred by allowing [Gen Water] to present

an undisclosed device as a demonstrative exhibit at trial." (Cleaned up.) We disagree with both arguments.

¶28　Under rule 26, a party's initial disclosures must identify "each fact witness the party may call in its case-in-chief" and must include, generally, "a copy of all documents, data compilations, electronically stored information, and tangible things in the possession or control of the party that the party may offer." Utah R. Civ. P. 26(a)(1). Demonstrative exhibits can be disclosed later, but "must be served on the other parties at least 28 days before trial." *Id.* R. 26(a)(5)(A)(iv), (a)(5)(B). Further, parties have a continuing duty to supplement their disclosures whenever they "learn[] that a disclosure . . . is incomplete or incorrect in some important way." *Id.* R. 26(d)(5).

¶29　"If a party fails to disclose or to supplement timely a disclosure . . . that party may not use the undisclosed witness, document, or material at any hearing or trial unless the failure is harmless or the party shows good cause for the failure." *Id.* R. 26(d)(4). "The sanction of exclusion is automatic and mandatory unless the sanctioned party can show that the violation . . . was either justified or harmless." *Sleepy Holdings LLC v. Mountain West Title*, 2016 UT App 62, ¶ 21, 370 P.3d 963 (cleaned up). Where the district court determines that the non-disclosing party has met its burden to show harmlessness or good cause, we will not question that determination absent an abuse of discretion. *See Blank v. Garff Enters. Inc.*, 2021 UT App 6, ¶ 22, 482 P.3d 258.

¶30　Here, the district court never reached those questions because Van Zweden and Rotzler abandoned their nondisclosure objections at trial. Once the parties had fully briefed the motion to exclude and the separate objection to Gen Water's rule 26(a)(5) disclosures, the court's first opportunity to address those matters was on the morning of trial. The court deferred its ruling on the pretrial motion to exclude "evidence of [Gen Water's] unspecified trade secrets," and it indicated that it would entertain those

objections at trial on a "question-by-question basis." "This certainly was a permissible means of proceeding." *See State v. Dibello*, 780 P.2d 1221, 1227 (Utah 1989).

¶31   Yet the defendants raised no contemporaneous nondisclosure objections to the evidence Gen Water presented at trial, other than objecting to two witnesses that Gen Water never intended to call. And when directly asked by the court, the defendants affirmatively represented that they had no objection to the admission of Gen Water's computer-assisted drawings of its machine—quintessential evidence of the design secret. Because the defendants chose not to pursue any specific objections at trial, the district court had no opportunity to determine whether a particular piece of evidence had been disclosed and, if not, whether Gen Water could establish either harmlessness or good cause for the nondisclosure. Therefore, "the issue was not adequately preserved for appeal."[3] *See id.*

¶32   As for Gen Water's undisclosed demonstrative exhibit, Van Zweden and Rotzler argue that the court erroneously permitted its use at trial "without conducting an analysis of whether [Gen Water] had good cause for its failure to disclose or whether the nondisclosure was harmless." Under a fair reading of the record, however, we think that the court engaged in such an analysis. Responding to the objection, Gen Water specifically argued that the nondisclosure of its demonstrative exhibit was harmless because the defendants could "bring in their own machine" for the same purpose. And moments later, when the court concluded that it would allow Gen Water to use its demonstrative exhibit, the court restated Gen Water's exact argument: "If the defendants wish to bring in their own machine

---

3. To the extent Van Zweden and Rotzler argue that Gen Water's failure to define its trade secrets in its disclosures meant that the case should not have gone to trial, they failed to request dismissal on that basis.

at some point and point to it, they may do the same thing." Therefore, the court presumably agreed with Gen Water's harmlessness analysis and allowed Gen Water to use its demonstrative exhibit on that basis. On appeal, Van Zweden and Rotzler have not challenged the court's harmlessness determination, so we have no reason to question it. And assuming the nondisclosure was harmless, the court acted within its discretion by allowing Gen Water to use its demonstrative exhibit at trial.[4]

## II. Sufficiency of the Evidence

¶33 Van Zweden and Rotzler next challenge the district court's denial of their motions for a directed verdict and JNOV, arguing that Gen Water failed to prove the existence of its trade secrets at trial. We agree, but only in part. For the reasons explained below, we hold that there was insufficient evidence with respect to the pricing secret but not the design secret.

¶34 Under the UUTSA, a plaintiff can obtain injunctive relief for "actual or threatened misappropriation." Utah Code Ann. § 13-24-3(1) (LexisNexis 2013). "Misappropriation" is defined as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or," under certain circumstances, the "disclosure or use of a trade secret of another without express or implied consent." *Id.* § 13-24-2(2). Thus, "a prima facie case of

---

4. Van Zweden and Rotzler point to the fact that, when they attempted to use a demonstrative exhibit of their own, "the court refused to allow it." But the exhibit was not "their own machine," which the court said it would allow; rather, the exhibit was a different machine built by the same inventor that Gen Water had retained when developing its product. Further, Van Zweden and Rotzler do not independently challenge the court's decision to exclude the inventor's machine as a demonstrative exhibit.

[trade secret] misappropriation is established on the basis of two essential elements: [1] existence of a protectable trade secret of a plaintiff and [2] demonstration of misappropriation by a defendant." *InnoSys, Inc. v. Mercer*, 2015 UT 80, ¶ 24, 364 P.3d 1013 (cleaned up). Van Zweden and Rotzler's arguments exclusively concern whether Gen Water established the first element—the existence of its trade secrets.

¶35    The UUTSA defines a "trade secret" as follows:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Utah Code Ann. § 13-24-2(4). "The plaintiff bears the burden of proving the existence of a trade secret" under this definition, "and there is no presumption in his or her favor." *See USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 45, 372 P.3d 629 (cleaned up).

¶36    Van Zweden and Rotzler argue that Gen Water failed to meet this burden with respect to either of its trade secrets. In their view, the evidence at trial failed to show either (A) that the pricing and design secrets were not generally known or readily ascertainable and (B) that Gen Water took reasonable efforts under the circumstances to keep them secret. Both assessments, however, were ultimately for the fact finder to make. *See id.* ¶ 52. We therefore ask "whether the jury could have reasonably

inferred from the evidence presented that" the pricing and design secrets "actually met the statutory standard." *See id.* ¶ 53; *see also Baird v. Baird*, 2014 UT 08, ¶ 29, 322 P.3d 728 ("When confronted with questions of fact, this court will only rule as a matter of law if the evidence is so clear and persuasive that all reasonable minds would find one way." (cleaned up)). With that standard in mind, we now turn to Van Zweden and Rotzler's arguments.

A.      Not Generally Known or Readily Ascertainable

¶37    A trade secret must "[d]erive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." Utah Code Ann. § 13-24-2(4)(a). Information is "not generally known" when it is "secret from at least some interested parties." *USA Power*, 2016 UT 20, ¶ 57 (cleaned up). Thus, "partial or limited disclosure of the information" is permitted under the UUTSA, and others can independently know of the information "so long as they also keep it confidential." *Id.* Whether information is "readily ascertainable by proper means" turns on "the ease or difficulty with which the information could be properly acquired or duplicated by others." *Id.* ¶ 59 (cleaned up); *see also Envirotech Corp. v. Callahan*, 872 P.2d 487, 494 (Utah Ct. App. 1994) (discussing how trade secrets are not "protect[ed] against discovery by fair and honest means, such as by independent invention, accidental disclosure, or by so-called reverse engineering" (cleaned up)). That is, if the information is obtainable "without much difficulty," then it is "readily ascertainable" and therefore ineligible for protection under the UUTSA.[5] *USA Power*, 2016 UT 20, ¶ 59 (cleaned up); *see also CDC*

---

5. Both the statutory text and our supreme court's decision in *USA Power* suggest that whether the information "derives independent economic value" from being secret constitutes a separate sub-

(continued…)

*Restoration & Constr., LC v. Tradesmen Contractors, LLC*, 2012 UT App 60, ¶ 26, 274 P.3d 317 ("Where information alleged to be a trade secret can be readily ascertained by performing a basic research task, the information does not qualify as a trade secret.").

¶38   Our supreme court has instructed that "the generally known or readily ascertainable standard cannot be viewed as whether the information is generally known and readily ascertainable to the general public, but, based on the defendant's knowledge and experience, whether the information was known or ascertainable to the defendant." *USA Power*, 2016 UT 20, ¶ 54 (cleaned up). This reflects the distinction courts have drawn "between confidential information" that a defendant learns while employed by the plaintiff—which sometimes qualifies as a trade secret—and the general "skill and knowledge of the [defendant's] trade"—which cannot. *Microbiological Rsch. Corp. v. Muna*, 625 P.2d 690, 696–97 (Utah 1981) (cleaned up). In other words, regardless of whether the defendant learned the information at issue from his employer, he cannot be sued for trade secret misappropriation if the information is already "known to others in [the] defendant's field of expertise." *See id.* at 698; *see also id.* at 698–99 (holding that defendant microbiologist could not be enjoined from using processes "that [any] competent microbiologist" could derive from "information published in the literature and his own general knowledge"); *J & K Computer Sys., Inc. v. Parrish*, 642 P.2d 732, 735 (Utah 1982) (holding that computer programmers could be enjoined from using a "proprietary accounts receivable program" not within "their general knowledge, skills, memory or experience"). In light of these standards, we address whether Gen Water produced

---

element of the analysis. *See* 2016 UT 20, ¶¶ 68–70 (quoting Utah Code Ann. § 13-24-2(4)(a) (LexisNexis 2013)). But Van Zweden and Rotzler do not challenge the sufficiency of the evidence supporting that sub-element.

sufficient evidence from which a jury could find that either the pricing secret or design secret met this legal standard.

1.      Pricing Secret

¶39    Van Zweden and Rotzler argue that Gen Water failed to present evidence that the pricing secret was not generally known or readily ascertainable. They argue that, like the "pricing information" at issue in *CDC Restoration & Construction, LC v. Tradesmen Contractors, LLC*, 2012 UT App 60, 274 P.3d 317, the pricing secret does not qualify as a trade secret as a matter of law.

¶40    We agree that the pricing secret is virtually indistinguishable from the pricing information at issue in *CDC Restoration*. In that case, a contractor sued a competitor for misappropriating information regarding "what a given project might cost." *Id.* ¶ 2. On appeal, we affirmed summary judgment in favor of the competitor on the basis that there was no "genuine issue of material fact as to" whether "the pricing information was not generally known and not readily ascertainable." *Id.* ¶ 19. The contractor had failed to set forth facts showing "how its pricing information was in fact developed," whether the information was "unique or especially innovative, such that it could not be readily duplicated by others in the industry," or whether it had "required great time or financial investment to develop." *Id.* ¶ 20. Absent any other supporting facts, the contractor's "pricing information [was] not, as a matter of law, entitled to trade secret protection."[6] *Id.* ¶ 27.

---

6. Van Zweden and Rotzler misconstrue *CDC Restoration* for the broader proposition that, as a matter of law, "labor and equipment pricing" can never be subject to trade secret protection. (Citing *CDC Restoration*, 2012 UT App 60, ¶¶ 27, 28 n.2.) Whether information qualifies as a trade secret is necessarily fact

(continued…)

¶41 Similarly, here, Gen Water merely claimed protection of the pricing of its products and services.[7] Gen Water presented no evidence that the company had expended "great time or financial investment to develop" its pricing, *see id.* ¶ 20, or that it had developed a unique process or formula for calculating the price of its product. As the billing specialist testified, Gen Water developed its pricing by adding together "the costs of . . . the [third-party] components that go into the system," "shipping," "sending an individual out to the lab," and labor—none of which were particularly unique considerations when it comes to developing the price of a product or service. *See id.* ¶ 17.

¶42 Moreover, Gen Water's pricing was "standard" across the board. Gen Water charged each customer the same price for the machine and service contract even though the costs to Gen Water varied by location. Although the billing specialist suggested that the fixed price incorporated a decision regarding Gen Water's profit margin, he could not describe how that varied from

---

dependent. Therefore, we decline to adopt a per se rule that anything classifiable as "labor and equipment pricing information" is necessarily unprotected. *See id.* ¶ 27.

7. The billing specialist also testified that Gen Water kept its "client list" secret. To the extent Gen Water claims that the pricing secret encompassed the "client list," we likewise see no evidence suggesting that such information was not generally known or readily ascertainable. Additionally, at various points in its brief, Gen Water characterizes the pricing secret as "pricing practices," "its pricing relationship with certain existing customers," "bidding and pricing strategies," and "bidding and client information," among other things. To the extent Gen Water claims that the pricing secret encompassed more than just the price of its products and services, such information was never "described as [a] trade secret[]" to the jury. *See USA Power*, 2016 UT 20, ¶ 53.

standard pricing decisions in the industry. There was no evidence to suggest that Gen Water's fixed pricing was "unique or especially innovative," much less that someone in the industry—Van Zweden and Rotzler included—could not have "readily duplicated" it using the same criteria. *See id.* ¶ 20.

¶43    In short, we see little difference between the pricing secret and the contractor's "pricing information" in *CDC Restoration*, which we held was ineligible for trade secret protection as a matter of law. *See id.* ¶ 27. Accordingly, we conclude that Gen Water presented insufficient evidence to support a finding that the pricing secret was not generally known or readily ascertainable. Van Zweden and Rotzler are therefore entitled to JNOV on that basis.

2.    Design Secret

¶44    Van Zweden and Rotzler also argue that Gen Water presented insufficient evidence to support a finding that the design secret was not generally known or readily ascertainable. They argue that the design secret cannot be a trade secret because Gen Water's machine consists entirely of third-party components. And they further assert that the machine uses the same multi-step process for producing Type I water as competitors' models,[8] which, in their view, defeats Gen Water's claim.

---

8. As far as we can tell, this assertion is unsupported by the record. Van Zweden and Rotzler only direct us to a portion of the consultant's testimony where he testified that each component part of Gen Water's machine came from a third-party supplier and that a separate machine developed by the inventor contained at least five of the same components used in Gen Water's filtration process. Thus, the consultant's testimony did not establish that Gen Water's filtration process was necessarily the same as competitors' models.

¶45    But these arguments misconstrue the scope of the design secret which, as Gen Water defined it, is "the design of its water purification machine." The design secret therefore was not limited to either the third-party components taken individually or even the multi-step process for producing Type I water. Rather, those elements are merely part of "the design of [Gen Water's] water purification machine." Under the UUTSA, even a "compilation of information already within the public domain" qualifies as a trade secret, so long as the compilation is not "generally known or readily ascertainable" when considered as a whole. *See USA Power*, 2016 UT 20, ¶ 54 (cleaned up). Accordingly, even though the individual components of Gen Water's machine or the multi-step process may not qualify as trade secrets, the design secret is still protectable if, taken as a whole, it meets the statutory elements.

¶46    The evidence presented at trial was sufficient for a reasonable jury to conclude that the design secret was a compilation of information not generally known or readily ascertainable. Gen Water's witnesses testified that, beginning in 2008, the company enlisted the help of an inventor to develop a product that differed from competitors' models. Two years later, Gen Water had produced a machine designed to minimize not only how much space it took up in medical labs, but how often it needed to be serviced—qualities that set it apart from other machines on the market. Given the time it took for Gen Water to develop its machine, the money it impliedly spent hiring an inventor, and the unique aspects of the final product, the jury could have reasonably inferred that the design secret was not generally known and not readily ascertainable by others with Van Zweden and Rotzler's general knowledge and experience.

¶47    Van Zweden and Rotzler argue that "even if [Gen Water's] design may have qualified as a trade secret prior to being placed on the market, it cannot be a trade secret once the device is sold and disclosed to the public." "'[T]rade secret law . . . does not offer

protection against discovery by fair and honest means, such as by independent invention, accidental disclosure, or by so-called reverse engineering, that is by starting with the known product and working backward to divine the process which aided in its development or manufacture.'" *Envirotech*, 872 P.2d at 494 (quoting *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475–76 (1974)). Accordingly, Van Zweden and Rotzler contend that once the machine was sold, the design secret became readily ascertainable through reverse engineering.

¶48　There was no evidence at trial to suggest that Van Zweden and Rotzler actually reverse engineered the design secret. Nor was there any direct evidence that reverse engineering was even possible. But because Gen Water had the burden of proof and "provided no evidence to contradict Med Water's assertion that the [Gen Water] device could be reverse engineered," Van Zweden and Rotzler claim that Gen Water failed to prove the existence of a trade secret.

¶49　Certainly, Gen Water had the burden to prove, as an element of its claim, that the design secret was not generally known or readily ascertainable. But Van Zweden and Rotzler have provided no authority for the proposition that a plaintiff can carry that burden only by affirmatively disproving all possible ways in which the information might be obtained through proper means. And where, as here, there is no evidence in the record to support the defense theory that the machine had been—or even could have been—reverse engineered, we question whether the plaintiff has a duty to prove a negative. *See State v. Johnson*, 856 P.2d 1064, 1073 (Utah 1993) ("The burden of proving a negative is nearly impossible to meet."), *superseded by statute on other grounds as recognized in State v. Hammond*, 2001 UT 92, ¶ 20, 34 P.3d 773; *see also Gordon v. State*, 2016 UT 11, ¶ 24, 369 P.3d 1255 (discussing how the burden of proof may shift "in circumstances where the responding party has unique access to proof of the matter in question").

¶50 Moreover, even assuming that it was theoretically possible to reverse engineer the design secret, it does not automatically follow that the information was readily ascertainable. The jury must still consider "the ease or difficulty with which the information could be properly acquired or duplicated by others," *USA Power*, 2016 UT 20, ¶ 59 (cleaned up), that is, by "persons who can obtain economic value from its disclosure or use," Utah Code Ann. § 13-24-2(4).

¶51 In *USA Power*, PacifiCorp claimed that it had reverse engineered USA Power's purported trade secret, making it readily ascertainable as a matter of law. 2016 UT 20, ¶ 60. Our supreme court rejected this argument on two grounds: (1) "the jury could have reasonably found that PacifiCorp did not actually reverse-engineer all of USA Power's confidential back-up studies" and (2) "the jury could have found that the information that was not reverse-engineered was also not readily ascertainable." *Id.* ¶ 62. The court observed that the confidential information that was not reverse engineered included "analyses [that] were done from the unique perspective of USA Power." *Id.* ¶ 66. The court questioned whether that information was ascertainable at all but concluded that, at the very least, "it was certainly reasonable for the jury to conclude that PacifiCorp could not have ascertained such information without much difficulty." *Id.* ¶ 67. The court also rejected PacifiCorp's argument that USA Power was required to present expert testimony on that point, emphasizing that "[w]hether information is readily ascertainable is an issue for the jury, which requires them to apply the facts presented to the correct legal standard." *Id.* The court concluded that "there was certainly enough evidence presented to determine that USA Power's proprietary business information was not readily ascertainable." *Id.*

¶52 In this case, there is no record evidence that Van Zweden and Rotzler did, in fact, reverse engineer the design secret. So "the

issue becomes whether the information that was not reverse-engineered was also not readily ascertainable." *See id.* ¶ 66.

¶53 Van Zweden and Rotzler claim that anyone who purchases one of Gen Water's machines can simply open it and discover the design secret with the help of an ordinary screwdriver. But the fact that the information is "revealed to certain customers . . . does not prevent the [information] from being classified as a trade secret where the plaintiff was attempting to keep the secret and the [information] is still unavailable to the [relevant] trade as a whole." *See Parrish*, 642 P.2d at 735. The question is whether the information is "readily ascertainable by proper means *by*[] *other persons who can obtain economic value from its disclosure or use*." Utah Code Ann. § 13-24-2(4) (emphasis added). For convenience, we use the term "competitor" as shorthand for this statutorily defined group.

¶54 In this case, the jury could reasonably infer that acquiring and duplicating the design secret would not have been easy given the way the machines were sold, installed, and recycled. *See Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 730 (7th Cir. 2003) ("Reverse engineering can defeat a trade secret claim, but only if the product could have been properly acquired by others, as is the case when the product is publicly sold."). The billing specialist testified that Gen Water sold its machines directly to healthcare facilities through its sales representatives. Because the machines were installed and serviced by Gen Water onsite, the jury could reasonably conclude that it would be exceedingly difficult for a competitor to obtain a machine by posing as a legitimate customer.

¶55 The jury could also infer that it would be a challenge for a competitor to access machines that had been directly sold to medical facilities. Even if a competitor could locate Gen Water machines without much difficulty, the jury could reasonably conclude that a competitor would not be at liberty to stroll into a

medical laboratory, remove a panel from an expensive piece of equipment, and examine the machine's interior. The jury could also infer that it would be difficult for a competitor to obtain a used machine from a customer based on the technician's testimony that, once a machine has "run its natural life," customers generally return it to Gen Water for disposal.

¶56    Finally, even assuming that a competitor could gain access to a machine without much difficulty, there was at least some evidence—the time and effort it took to develop the design secret—that could have supported a jury finding that reverse engineering could not be accomplished easily. Therefore, even if the design secret was susceptible to reverse engineering, there was at least some evidence to support the jury's conclusion that it was "not . . . readily ascertainable by proper means by[] other persons who [could] obtain economic value from its disclosure or use." *See* Utah Code Ann. § 13-24-2(4).

¶57    Lastly, Van Zweden and Rotzler assert that Gen Water "made its product design publicly available" by posting a photo of the machine's interior on its website. But as the technician testified, the photo showed only a limited portion of the interior. The jury was entitled to credit that testimony, including the technician's assertion that recreating the machine from the photo was "comparable to looking at a dashboard on a car and be[ing] able to wire the speedometer."

¶58    Having disposed of Van Zweden and Rotzler's arguments to the contrary, we hold that there was sufficient evidence to support the jury's determination that the design secret was not generally known or readily ascertainable. We reemphasize the "difficult standard of review" Van Zweden and Rotzler face on appeal and, accordingly, the degree of deference we afford the jury's decision. *See USA Power*, 2016 UT 20, ¶ 43. "We do not reweigh the evidence and decide if we think the jury got it right." *See id.* "[R]ather, we only review the record before us to determine

if there was an adequate basis in the evidence to support the jury's verdict," *see id.* ¶ 52, disregarding, as we must, "any conflicting evidence or evidence that tends to disprove the prevailing party's case," *see Collins v. Wilson*, 1999 UT 56, ¶ 14, 984 P.2d 960. Under that standard, we cannot say that no reasonable jury could have found that the design secret was not generally known or readily ascertainable.

B.      Reasonable Efforts to Maintain Secrecy

¶59     Because there was sufficient evidence that the design secret was not generally known or readily ascertainable, we turn to Van Zweden and Rotzler's argument that Gen Water failed to show that the design secret was "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Utah Code Ann. § 13-24-2(4)(b). Utah courts have yet to squarely address this element of the analysis. *See John Bean Tech. Corp. v. B GSE Group, LLC*, 480 F. Supp. 3d 1274, 1296 (D. Utah 2020). But the plain statutory language requires only "reasonable efforts," not "all conceivable efforts." *See id.* (cleaned up). Whether the efforts to maintain secrecy "are reasonable under the circumstances" is a question of fact for the jury. *See* Utah Code Ann. § 13-24-2(4)(b).

¶60     Van Zweden and Rotzler argue that Gen Water did not make reasonable efforts to maintain secrecy because it did not "require [them] to sign confidentiality . . . or non-competition agreements." But under Utah law, no written contract is required to impose a duty on former employees not to "use confidential information obtained during the course of [their] employment." *See Envirotech*, 872 P.2d at 497 (cleaned up). Regardless, the existence of written confidentiality agreements is merely evidence of a plaintiff's efforts to keep information secret, *see, e.g.*, *Avnet, Inc. v. Wyle Lab'ys, Inc.*, 437 S.E.2d 302, 304 (Ga. 1993); *Central, Inc. v. Morrow*, 489 N.W.2d 890, 894–95 (S.D. 1994); the absence of such agreements does not compel the conclusion that the plaintiff's other measures did not amount to "reasonable efforts . . . under

the circumstances," *see* Utah Code Ann. § 13-24-4(4)(b); *see also Editions Play Bac, SA v. Western Pub. Co.*, No. 92 Civ. 3652, 1993 WL 541219, at \*8 (S.D.N.Y. Dec. 28, 1993); *Alpha Pro Tech, Inc. v. VWR Int'l LLC*, 984 F. Supp. 2d 425, 437–38 (E.D. Pa. 2013); *Retirement Corp. of Am. v. Henning*, No. C-180643, 2019 WL 5856005, at \*5 (Ohio Ct. App. Nov. 8, 2019).

¶61 Gen Water presented testimony that the machine's schematics were locked in a safe to which only the consultant knew the combination. The jury was entitled to weigh that evidence against the absence of written confidentiality agreements in determining whether Gen Water's efforts to maintain secrecy were reasonable under the circumstances. Once again, "it is not our role to determine, in the first instance, whether we would" reach the same conclusion as the jury did here. *See USA Power*, 2016 UT 20, ¶ 52. It is enough that "the jury could have reasonably inferred from the evidence presented that" Gen Water had met its burden. *See id.* ¶ 53. Here, the testimony that Gen Water kept the schematics locked in a safe is a sufficient evidentiary basis for the jury's conclusion that the design secret was subject to reasonable efforts to preserve its secrecy. Therefore, as to the design secret, we hold that the district court correctly denied Van Zweden and Rotzler's motions for directed verdict and JNOV, and we affirm accordingly.

### III. Scope of the Injunction

¶62 Lastly, Med Water appeals the district court's denial of its motion to clarify the scope of the injunction. As modified by the district court, Van Zweden and Rotzler may be subject to contempt for violating the injunction—along with "any person [acting] in concert or participation with" them who has "notice of the injunction." Med Water takes issue with this language, reasoning that, "when the jury found that Med Water did not misappropriate trade secrets, the jury necessarily found that Med Water, acting through Van Zweden, did not misappropriate trade

secrets." Thus, by enjoining "any person [acting] in concert or participation with Van Zweden," Med Water argues that the district court has erroneously barred "Med Water from engaging in the very conduct that the jury found did not constitute misappropriation—selling its water filtration devices . . . through" Van Zweden.

¶63   We read Med Water's motion to clarify as a request to modify the terms of the injunction to expressly exclude Med Water from the class of persons enjoined from aiding and abetting Van Zweden's violation of the injunction.[9] The relevant language in the injunction comes from rule 65A(d) of the Utah Rules of the Civil Procedure, which states that injunctions are binding "upon those persons in active concert or participation with [the enjoined party] who receive notice, in person or through counsel, or otherwise, of the order." Utah R. Civ. P. 65A(d). This rule incorporates the common law doctrine that "a person who knowingly assists a defendant in violating an injunction subjects himself to civil as well as criminal proceedings for contempt." *See Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832–33 (2d Cir. 1930). Otherwise, an enjoined party could easily "nullify a decree [of injunction] by carrying out prohibited acts through aiders and abettors." *See Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945).

¶64   We are aware of no authority suggesting that this rule functions differently where the person who assists the enjoined party in violating the injunction was also a codefendant in the underlying action but was found not liable by a jury. As Gen Water persuasively argued below, "the jury's verdict merely makes Med Water the functional equivalent of a non-party. Yet, it is well-settled that non-parties who act in concert or participate

---

9. To the extent Med Water sought a ruling on whether its intended course of action—continuing to sell through Van Zweden—would violate the injunction, it has not invoked any legal authority for seeking such an advisory opinion.

with parties subject to an injunction are likewise subject to the restraints of that injunction provided that they receive notice of it." (Citing *BMW of N. Am., LLC v. Issa*, No. 2-19-cv-220, 2020 WL 1325278, at *5 (D. Utah Mar. 20, 2020).) Because Gen Water has cited no authority exempting Med Water from the class of persons prohibited from aiding and abetting Van Zweden's violation of the injunction, we affirm the district court's denial of the motion to clarify. [10]

## CONCLUSION

¶65 There was sufficient evidence at trial to support the jury's verdict as to the design secret, but not the pricing secret. Therefore, Van Zweden and Rotzler are entitled to judgment notwithstanding the verdict on the pricing secret. We affirm in all other respects and remand for further proceedings consistent with this opinion.

———————

10. Furthermore, because rule 65A(d) governs "[e]very . . . order granting an injunction," it necessarily applies to a district court's injunction regardless of its terms. *See* Utah R. Civ. P. 65A(d). We therefore fail to see how the district court could have abused its discretion by refusing to modify the injunction in a way that would have lacked legal effect.